**NORFOLK & WESTERN COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES of America, and Dunbar & Sullivan Dredging Company,**
Defendants–Appellees.

No. 78–3271.

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1980.

Decided Oct. 21, 1980.

Robert G. McCreary, Jr. (argued), William J. Miller, Arter & Hadden, Donald Kronenberger, Cleveland, Ohio, for plaintiff–appellant.

James R. Williams, U. S. Atty., Cleveland, Ohio, Michael K. Bell, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendants–appellees.

Edward J. Cass (argued), Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, for Dunbar & Sullivan.

Before CELEBREZZE, KEITH and MERRITT, Circuit Judges.

KEITH, Circuit Judge.

This appeal is taken from the judgment of the United States District Court for the Northern District of Ohio, the Honorable John M. Manos presiding, dismissing Norfolk & Western Railway Company's complaint alleging 1) that Dunbar had breached provisions of the construction contract of which Norfolk & Western was an intended beneficiary; 2) that the United States and

Dunbar were negligent in failing to investigate the capacity of the dock to support the load and therefore caused the dock to collapse; and 3) that the defendants were required by the Rivers and Harbors Act of 1899 to remove the obstruction to navigation created by the collapsed dock. This litigation followed the collapse of a dock which Norfolk & Western had leased to the United States for storage in a forthcoming construction contract with Dunbar & Sullivan Dredging Company.

Norfolk & Western furnished to the Defendant–Appellee United States part of a dock for use as storage in a future project. Thereafter, the United States entered into an agreement with defendant–appellee Dunbar & Sullivan Dredging Company, whereby Dunbar was to build the project and use the dock for storage. When Dunbar unloaded from a ship 5,000 tons of stone on Norfolk & Western's dock, the dock collapsed and stone and debris fell into the river.

When demand by Norfolk & Western against the United States and Dunbar to remove the wreckage from the river was refused, Norfolk & Western removed the debris at its own expense. Norfolk & Western then made demand on the United States and Dunbar to repair its dock. When this demand was refused as well, Norfolk & Western brought suit in United States District Court for the Northern District of Ohio for the costs of removal and repair.

Subject matter jurisdiction for Norfolk & Western's admiralty claims was premised on the Admiralty Extension Act, 46 U.S.C. § 740, which extends the court's admiralty jurisdiction, 28 U.S.C. § 1333, to cases involving damage caused by a vessel on navigable water, even if the damage occurred on land. Norfolk & Western's third party beneficiary claim against Dunbar was granted pendent jurisdiction by the district court under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

After the district court concluded that neither defendant was liable upon any of the grounds advanced by Norfolk & Western and dismissed the complaint, Norfolk & Western appealed to this court alleging that: 1) the district court failed to apply proper standards of law in holding that the proximate cause of the collapse was a latent defect in the dock rather than negligent overloading of the dock; 2) the district court misconstrued the construction contract in ruling that Norfolk & Western was not an intended beneficiary of the safety and repair obligations of Dunbar thereunder; and 3) in finding that the stone and debris which fell into the river did not create an obstruction to navigation, the district court disregarded wholly uncontradicted evidence to the contrary, which, if accepted, would entitle Norfolk & Western to removal costs.

We affirm the judgment of the district court on the issues of the proximate cause of the dock's collapse, and of Norfolk & Western's third–party rights under the contract. We reverse on the obstruction to navigable capacity issue and imply a private right of action under Section 12 of the Rivers and Harbors Act as a remedy to Section 10 violations. In addition we order defendants–appellees to reimburse Norfolk & Western for one–half of the costs incurred in removing the debris caused by the dock's collapse.

I.

In 1970 the United States Corps of Engineers was authorized by Congress to construct a spoil disposal facility for the containment of spoil dredged from the Huron River. In December, 1973, the City of Huron, Ohio furnished the United States with the work areas, easements, and rights–of–way necessary for the construction of the disposal facility. Among the work areas furnished by the City of Huron was the southern part of the Huron Ore Dock, property to which the Lake Erie Dock Company, a subsidiary of plaintiff Norfolk & Western Railway Company, holds a 99–year lease.

Sometime in January, 1974 the United States asked Lyle Sprankel, president of the Lake Erie Dock Company, if his company

could provide additional work space for the project. On January 29, 1974 Sprankel wrote the United States that the northernmost corner of the peninsula–shaped Huron Ore Dock would also be made available.

. On April 17, 1974 the United States entered into a contract with the defendant Dunbar & Sullivan Dredging Company for the construction of the spoil disposal facility in Huron, Ohio. Under the terms of the contract Dunbar was to act as an independent contractor. It was Dunbar's responsibility to obtain, and store if necessary, most of the construction materials needed for the facility. Also, the contract gave Dunbar the use of the two work areas supplied by the Lake Erie Dock Company, Norfolk's subsidiary.

The contract between the United States and Dunbar was entered into with the understanding that Dunbar would purchase crushed stone that could be barged directly to the construction site from the quarries of the Marblehead Stone Division. In the summer of 1974, a labor dispute at Marblehead threatened to delay progress on construction. As a result, the contract between Dunbar and the Corps was modified to provide for obtaining stone from sources other than Marblehead. The Inland Lime and Stone Company was selected as an alternative supplier. The stone supplied by Inland Lime was transported in large quantities by lake–going vessels and it was necessary for Dunbar to place the stone in an interim storage area until it was taken to the construction site. Dunbar determined, after discussion with Sprankel about the feasibility of storing a boat load of stone on the North Dock, that the North Dock could accommodate the self–unloading lake vessels sent from Inland Lime and used it as the interim storage place for the incoming stone.

The construction of the Huron disposal facility began in the summer of 1974. In early August, 1974 Dunbar received word that the first shipment from Inland Lime, 21,000 tons of stone carried by the Adam E. Cornelius, would arrive on August 22, 1974. In preparation for the Adam E. Cornelius'

arrival Dunbar took depth soundings along the two seaward sides of the North Dock. The soundings showed the river channel was deep enough to accommodate the Adam E. Cornelius. Also, the soundings demonstrated that no cell fill material had escaped the cellular cofferdams that ringed the North Dock.

Prior to the arrival of the Adam E. Cornelius, Dunbar had used the North Dock to store miscellaneous small equipment. Since the area was overgown with brush and small trees it was cleared off with a bulldozer before the ship's arrival. The bulldozing revealed that the upper two to three feet of the North Dock was composed of sand and gravel. The district court found that although it had the necessary equipment, Dunbar did not conduct any tests to determine the composition of the sub–soil of the North Dock.

A Dunbar employee, Lionel Demers, visually inspected the North Dock after it had been cleared off and concluded that it could support the Adam E. Cornelius' load. The basis for Demers's conclusion was his knowledge of structures similar to the Huron Ore Dock. Demers also called Lyle Sprankel and informed him of the Adam E. Cornelius' arrival. Sprankel knew the Adam E. Cornelius carried approximately 20,000 tons of stone and he expressed no reservation to Demers about putting the stone there.

On August 22, 1974 the Adam E. Cornelius arrived at Huron Harbor. The self–unloading ship placed about 4,000 tons into barges and then started to discharge the remainder of her cargo onto the North Dock. Demers directed that the stone be placed uniformly abound the perimeter of the one acre of land that comprised the North Dock until the perimeter pile was about ten feet high. Then Demers instructed that the balance of the stone be discharged at the center of the North Dock.

After approximately 5,000 tons had been placed on the North Dock's center, and about ten minutes into the unloading process, a section of the dock's western wall gave way and a good deal of stone, as well

as some of the North Dock itself, slid into the Huron River. Within a week following the collapse, Dunbar had a diver's survey performed. The survey revealed that cell No. 21, constructed in 1936, had split open at an interlock, thereby permitting cell fill to slide into the harbor. Adjacent cells were leaning outward as the consequence of the failure of cell No. 21.

Both parties retained independent experts to investigate the cause of the collapse. Norfolk & Western's experts concluded, based on their observations and soil test borings performed in 1969, that the factor of safety in overturning was less than one and that therefore the collapse of the North Dock was a result of it having been overloaded. Dunbar's expert concluded, after laboratory analysis of soil samples taken from the same test borings used by Norfolk & Western's experts, that the safety factor exceeded one. The soil samples taken by Dunbar's expert were subjected to laboratory analysis and found to consist mainly of silt rather than clay. As Dunbar noted in its brief, the distinction between silt and clay is significant from a soil mechanical viewpoint, and the fact that the two experts differed in their assumptions as to the soil's substance in part accounts for the differences in their calculations of safety factors.

The district court however was unpersuaded by the testimony of Norfolk & Western's experts. The court credited the testimony of Dunbar's expert and concluded that the fill material in cell 21 consisted of 10 feet of sand and gravel on top of approximately 20 feet of "clayey silt (90% silt and 10% clay)"[1] and attributed the collapse of the North Dock's western wall to the failure of one of the wall's cellular cofferdams.[2] In its memorandum opinion the district

---

**1.** In a footnote to its memorandum opinion, the district court explained its reasoning in crediting the testimony of Dunbar's experts.

"Since the fill material inside cell 21 slid into the river when the North Dock collapsed, that same fill could not be analyzed. Other cells that were constructed at the same time as cell 21 are still intact however; of these, cell 18 stands the closest (within 60 feet) to where cell 21 had been. Presumptively, then, the fill material within cell 18 should probably be about the same or similar to that which would have been found within cell 21.

Two test borings were performed within cell 18 and it was determined that the first 10 feet of the fill material consisted of sand and gravel and the remaining 20–25 feet consisted of a soft gray silt that had some clay in it.

At trial Norfolk urged the court to find that cell 21 was filled with a soft clay, whose cohesiveness is considerably less than silt's. The basis for the plaintiff's contention was the testimony given by its expert witnesses, two Hardesty & Hannover engineers. These engineers testified that in their opinion cell 21 was filled with a soft clay. They based their opinion on their observation of the removal operations during which they observed the fill material being removed from cell 77 and on a report of a test boring conducted in 1969 at a spot some 140 feet east of the North Dock's western wall. The court, however, was not persuaded by the testimony of the Hardesty & Hannover engineers.

The soil properties of the fill within cell 18, constructed at the same time as cell 21, are probably more indicative of the subsoil conditions of cell 21's fill material than the properties of the fill within cell 77, which was constructed nine years after cell 21. Also, the report of the 1969 test borings relied upon by the Hardesty & Hannover engineers, which varies slightly from the results of the more recent test borings taken inside cell 18, has been examined by the court and does not dissuade the court from finding that cell 21 was not totally filled with clay."

**2.** A sheet piling interlock on the face of cell 21 split open and the face of that cell literally unzippered, causing its fill material to spill out into the Huron River channel. The void inside cell 21 and the pressure the stone surcharge exerted upon cell 21's backwall then combined to cause that backwall to bend sharply towards the river. The movement of these two diaphragms in turn caused the failure of the cells adjoining cell 21 (cells 20 and 22) and set off a chain reaction of cell failures along the western wall of the North Dock.

When the sheet piling that had formed the face of cell 21 was removed from the Huron River Channel after the collapse, two separate breaks were found in the interlock that had split open. A much older break was found in addition to the large fresh break that had unzippered the interlock. This old break had occurred just above the fresh one and had left the interlock weakened. This weakened condition explains the surprising ease with which the pressure from only 5,000 tons of stone was able to split the interlock open.

court stated that given the composition of cell 21's fill material and the weight and approximate configuration of the stone pile, it was mathematically shown that cell 21 should not have burst under the weight of its surcharge. The district court concluded that, taken altogether, all of the evidence permitted the conclusion that a structural defect in a sheet metal interlock caused the failure of cell 21 and was the proximate cause of the collapse of the North Dock's western wall.

The part of the stone wall that fell into the Huron River was removed by Dunbar shortly after the collapse, but the section of the North Dock that had given way remained in the river. Although finding that this debris did not obstruct the navigation of the river, the district court did note that at its furthest point the debris from the dock collapse extended approximately 35 feet into the river channel.

After making demands upon both Dunbar and the United States to remove the debris and repair the North Dock, Norfolk removed the debris itself in April–May of 1975, and on August 8, 1975 it filed an action in the United States District Court for the Northern District of Ohio to recover the costs of its removal operations and the costs of repairing the North Dock.

## II.

The district court concluded as a matter of law that the defective interlock was the proximate cause of the North Dock's collapse. In addition, it held that the faulty interlock was a latent defect that could not have been discovered by the United States or Dunbar even if they had done the testing that Norfolk claims was required of them. Thus, the district court found Dunbar's and the United States' alleged failure to determine whether the sub–soil conditions of the North Dock were sufficient to bear the stone surcharge to be immaterial to its ruling.

Norfolk & Western now appeals the district court's ruling claiming that its finding that a latent defect in the dock was the proximate cause of the dock collapse is

clearly erroneous. Norfolk & Western argues that the district court misapplied the standard for the latent defect defense. In addition to showing that the tests urged by plaintiff–appellant would not have revealed the structural defect in the dock, Norfolk contends that Dunbar should have been required to show that the existence of a latent defect was not reasonably foreseeable in order to carry its burden of providing the latent defect defense.

To the extent that Dunbar did carry out hydrographic sounding testings and found no evidence of shoaling, which would have indicated a defect in the dock face, and discussed the intended use of the dock with Sprankel, under whose management Norfolk & Western had committed the dock, we are satisfied that Dunbar attempted to guard against any unforeseeable defects in the dock, and therefore acted prudently and non–negligently. However, assuming the correctness of the district court's definition of "latent defect", any testing performed by Dunbar would not have exposed the defect in the dock, so that its failure to determine the sufficiency of the sub–soil conditions to bear the weight of the stone becomes immaterial.

The district court cited *Waterman S. S. Corp. v. U. S. Smelting, Refining, & Mining Co.*, 155 F.2d 687 (5th Cir. 1946), *cert. denied*, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946), to support its definition of "latent defect." *Waterman* defined a latent defect in metal as a defect which is not caused by the use of the metallic object, and is not a gradual deterioration, but rather is a defect or flaw in the metal not discoverable by any known or customary test. While the *Waterman* case defines "latent defect" within the context of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304, the definition stated therein has general applicability. *See Ferrante v. Detroit Fire & Marine Ins. Co.*, 125 F.Supp. 621 (S.D.Calif.1954) ("latent defect" is a hidden defect and generally involves the material out of which the thing is constructed, as distinguished from the results of wear and tear.); *Hubshman v. Louis Keer Shoe Co.*, 129 F.2d 137 (7th

Cir. 1942) (defects in shoes which could be discovered only be tearing down the shoes or examining them under x–ray were "latent defects"). *See also Ernest Co. v. Tug Commodore*, 294 F.Supp. 15 (S.D.Ala.1968).

■ The trial court found that the proximate cause of the dock's collapse was a latent defect in the interlock of cell 21, and not any alleged breach of duty on Dunbar's part. Norfolk & Western seeks to overturn this finding as not supported by the evidence, and therefore clearly erroneous. In its memorandum opinion the trial court stressed two lines of testimony as support for its conclusion that the collapse was proximately caused by a defective interlock: 1) that the interlock of cell 21 was in a weakened condition at the time of the collapse, and 2) that it was mathematically improbable, crediting testimony that the safety factor was greater than unity, that the collapse was caused by an overloading of the dock.

Whether or not we would have concluded in the first instance that the proximate cause of the collapse was a latent defect in the dock's structure, we do find the district court's conclusion to be adequately supported by the evidence of record. Accordingly, we affirm that portion of the district court's judgment dismissing Norfolk & Western's negligence claims against the United States and Dunbar.

### III.

Norfolk & Western's second claim of error is that it is a third–party beneficiary of the obligations incurred by Dunbar under its (Dunbar's) construction contract with the United States, and is therefore entitled to damages for Dunbar's alleged breach of the contract, contrary to the district court's holding. The district court held that Norfolk & Western was not an intended beneficiary of the contract between Dunbar and the United States, and therefore had no enforceable rights under the contract.

Norfolk & Western pointed to four provisions of the construction contract between the United States and Dunbar to support its third–party beneficiary claim. Those four provisions provide that Dunbar: 1) "shall take proper safety and health precautions to protect the work, the workers, the public, and the property of others"; 2) "will protect from damage any existing improvements or utilities at or near the site of the work"; 3) will "comply with all pertinent provisions of the Corps of Engineers Manual"; and 4) shall with the utmost dispatch recover and remove any material thrown overboard, sunk or misplaced which, in the opinion of an Army Corps officer, may be dangerous to, or obstructive of navigation.[3]

---

3. The full language of the pertinent provisions of the contract is as follows:

PERMITS AND RESPONSIBILITIES

The contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the prosecution of the work. He shall be similarly responsible for all damages to persons or property that occur as a result of his fault or negligence. He shall take proper safety and health precautions to protect the work, the workers, the public, and the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted.

PROTECTION OF EXISTING VEGETATION, STRUCTURE, UTILITIES, AND IMPROVEMENTS

The contractor will protect from damage any existing improvements or utilities at or near the site of the work, the location of which is made known to him, and will repair or restore any damage to such facilities resulting from failure to comply with the requirements of this contract or the failure to exercise reasonable care in the performance of the work. If the contractor fails or refuses to repair any such damage promptly, the contracting officer may have the necessary work performed and charge the cost thereof to the contractor.

ACCIDENT PREVENTION

In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract, the contractor shall comply with all pertinent provisions of Corps of Engineers Manual, EM 385–1–1, dated 1 March 1967, entitled: "General Safe-

In applying Ohio state law[4] the district court applied the "intent to benefit" test to distinguish between incidental beneficiaries and beneficiaries with enforceable rights. Under this analysis, if the promisee, the United States in this case, intends that a third party should benefit from the contract, then that third party is an "intended beneficiary" who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third–party beneficiary to the contract is merely an "incidental beneficiary", who has no enforceable rights under the contract.

Both Norfolk & Western and the defendants Dunbar and the United States claim that the Ohio Supreme Court's opinion in *Visintine & Co. v. New York, Chicago & St. Louis R. Co.*, 169 Ohio St. 505, 160 N.E.2d 311 (1959), supports their position. In *Visintine* the State of Ohio entered into several separate contracts for a grade crossing elimination project. Plaintiff Visintine was one of the contractors, and the defendant railroad companies were other contractors. There was no contract between plaintiff and the defendants, each of the contracts calling for cooperation among the contractors and the State. Under its contract with Visintine, the State assumed certain obligations to Visintine, the performance of some of which was undertaken by the defendants. In holding plaintiff Visintine to be a "creditor beneficiary", and to possess therefore enforceable rights under the contracts between the railroad companies and the State, the court stated:

> The State of Ohio owed certain duties to plaintiff under the contract entered into between them. Among those duties was that of providing plaintiff with a site on which it could perform its work without hindrance or delay and of doing those things which it promised to· do at such time and in such manner as would not hinder or delay the plaintiff . . . The performance of those duties was undertaken by the defendants under their contracts with the State of Ohio. Since the contracts between defendants and the State, in addition to the performance of certain obligations assumed by the defendants for the benefit of the state, provided, also, for the performance of certain obligations owed by the state to the plaintiff, it would seem that plaintiff falls squarely within the definition of "creditor beneficiary". *Visintine*, 169 Ohio St., at 508, 160 N.E.2d 311.

The court went on to indicate that the mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract was insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary. Quoting from 4 *Corbin on Contracts*, 20, Section 776, the Court stated, "[t]he question is not 'whose interest and benefit are primarily subserved', but what was the performance con-

ty Requirements", as amended, and will also take or cause to be taken such additional measures as the contracting officer may determine to be reasonably necessary for the purpose.

MISPLACED MATERIAL (Special Provision II)

(This clause is applicable only to contracts involving work near, or on navigable waterways) Should the contractor during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which, in the opinion of the contracting officer may be dangerous to or obstruct navigation, the contractor shall recover and remove the same with the utmost dispatch. The contractor shall give immediate notice, with description and location of such obstructions, to the contracting officer or inspector, and when required shall mark or buoy such obstructions until the same are removed. Should he refuse, neglect, or delay compliance with the above requirements, such obstructions may be removed by the contracting officer, and the cost of such removal may be deducted from any money due or to become due the contractor, or may be recovered under his bond. The liability of the contractor for the removal of a vessel wrecked or sunk without fault or negligence shall be limited to that provided in sections 15, 19, and 20 of the Rivers and Harbors Act of March 3, 1899. (33 U.S.C. 410 *et seq.*)

4. Norfolk & Western's third–party beneficiary claim was a state law claim brought under the federal district court's pendant jurisdiction, along with its two main admiralty claims, brought under 28 U.S.C. § 1333.

tracted for and what is the best way to bring it about."[5]

■ The district court in the instant case carefully examined the provisions of the contract between Dunbar and the United States, particularly those provisions pointed out by Norfolk & Western, to ascertain the performance contracted for and to determine whether an "intent to benefit" Norfolk & Western was evidenced in the contract. The district court found that all of the obligations incurred by Dunbar under the contract ran to the United States, with none running to Norfolk & Western, and noted that it was purely incidental that some provisions of the contract could require action of Dunbar that would benefit Norfolk. These provisions, the district court found, evidenced the United States' interest in saving itself the unnecessary expense that would result from any careless conduct on the part of Dunbar, and not an intent by the United States that Norfolk should benefit by its agreement with Dunbar.

A more recent Ohio Court of Appeals opinion supports the district court's interpretation of the contract between United States and Dunbar. In *New York, Chicago & St. Louis Rd. Co. v. Heffner Construction Company,* 9 Ohio App.2d 174, 223 N.E.2d 649 (1967), following a collision with a dump truck driven by an employee of one of Heffner's subcontractors, the railroad sued Heffner arguing that it was a third–party beneficiary to the contract that Heffner entered into with the State of Ohio.

The railroad based its third–party beneficiary claim on a term of that contract that has substantially the same tenor as the terms Norfolk attempted to rely on in the case before this court:

the contractor [Heffner] shall provide all safeguards ... and take any other needed actions ... reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

After holding that this term applied only to on–the–job accident prevention, which excluded the facts before it because the collision in *Heffner* occurred on a public highway far from the work site, the *Heffner* court went on to hold:

(This provision does) not purport to place upon the contractor legal responsibility or liability to third party beneficiaries for the misfeasance, or negligence, of either his own agents or employees of his subcontractors. *Id.* at 183, 223 N.E.2d at 657.

Finding no error in the reasoning and conclusions of the district court, we affirm its holding that Norfolk & Western was not an intended beneficiary to the contract between Dunbar and the United States, and therefore had no enforceable rights against Dunbar under the contract.

## IV.

The district court never reached Norfolk & Western's claim of a private right of action under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, because it found that the debris from the dock collapse did not create an obstruction to navigation within the meaning of Section 10 of the Act, and therefore denied Norfolk & Western reimbursement for its removal costs. Finding that the district court misconstrued Section 10 of the Act, we reverse its holding that no obstruction was created, and determine further that a private right of action

---

**5.** The court went on to quote approvingly the Ohio Court of Appeals opinion in *Visintine* at 509–510, 160 N.E.2d 311:

"We are of the opinion that in considering the railroad contracts and the plans and specifications it is apparent that it was intended to benefit the contractor, as they all provided for cooperation in order that the job might be completed as scheduled ...

Throughout all contracts it was made plain that the work of Visintine was dependent upon the performance by the railroads of their contractual obligations and vice–versa. By each performing their obligations in the proper sequence a benefit was incurred upon the other by permitting them to complete their work in accordance with the terms of their various contracts."

is implied under Section 10 of the Act to redress such obstructions.

Section 10 of the Rivers and Harbors Act prohibits the creation of *any obstruction,* not affirmatively authorized by Congress, to the *navigable capacity* of any of the waters of the United States. The district court apparently assumed that because there was no disruption of the river traffic that frequented the Huron Ore Dock, no obstruction within the meaning of Section 10 of the Act existed. However, this reading of the statute does not interpret the words "capacity" and "obstruction" as liberally as Congress intended.[6]

■ The prohibition against creating any obstruction to the navigable "capacity" does not require proof that a vessel has actually been impeded. Rather, it is sufficient if the obstruction reduces the capacity of the stream to be fully navigable. In referring to the predecessor of Section 10, the Supreme Court stated in *United States v. Rio Grande Irrigation Co.,* 174 U.S. 690, 708, 19 S.Ct. 770, 777, 43 L.Ed. 1136 (1898):

> [T]he language is general and must be given full scope. It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done or however done . . . which tends to destroy the navigable capacity . . . is within the terms of the prohibition.

*See also Hubbard v. Fort,* 188 Fed. 987 (C.C.D.N.J.1911) (holding that "navigable capacity" is the capability of being navigated over any part of waters, when in their normal condition); and *Sierra Club v. Andrus,* 610 F.2d 581 (9th Cir.) 1979 U.S. appeal pending No. 79–1625.

■ Similarly, "obstruction" within the meaning of Section 10 of the Act, is to be liberally construed. The statute proscribes the creation of any obstruction to the navigable capacity of any of the waters of the United States unless affirmatively authoriz-ed by Congress. The statute goes on in the second and third clauses to permit certain activities in navigable waters, provided that they proceed on plans "recommended by the Chief of Engineers and authorized by the Secretary of the Army", including the building of structures in navigable waters and the alteration or modification "in any manner" of the condition, capacity, or channel of any navigable water. In an exhaustively researched opinion, *Sierra Club v. Andrus,* 610 F.2d 581 (9th Cir. 1979), U.S. appeal pending No. 79–1625, the Ninth Circuit recently concluded that the building activities mentioned in clauses 2 and 3 of Section 10 are *presumed* to be obstructions, with permits issuing from the Secretary only upon a determination that such obstructions are reasonable. Thus, the Court of Appeals declined to adopt the point of view taken by the lower court[7]–the focus of which was the determination of whether a given diversion constituted an obstruction to navigable capacity–adopting instead an analysis which focused on whether there had been any modification or alteration of the condition or capacity of the water:

> In short, the Corps must authorize any of the structures or activities enumerated in clauses 2 and 3, which are *presumed* to constitute obstructions. The need for applying to the Corps for a permit does not depend on some prior determination that there has been an obstruction to navigable capacity.

Even more explicit is the opinion of the Supreme Court in *United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1959). There, the court held that the unauthorized deposit of industrial solids in the Calumet River, which reduced its depth by four to nine feet in some places, constituted an obstruction to navigable capacity and thus a violation of Section 10. The Court carefully distinguished between the three clauses of the section:

---

**6.** *See United States v. Republic Steel Corp.,* 362 U.S. 482, 491, 80 S.Ct. 884, 889, 4 L.Ed.2d 903 (1959), holding that the statute is to be read: "charitably in light of the purpose to be served [i. e. protection of the navigable capacity of waters in the United States]" which "forbids a narrow, cramped reading" of the section.

**7.** *Sierra Club v. Morton,* 400 F.Supp. 610 (N.D. Calif.1975).

The reach of § 10 seems plain. Certain types of structures enumerated in the second clause, may not be erected "in" any navigable river without approval by the Secretary of the Army. Nor may excavations or fills, described in the third clause, that alter or modify "the course, location, condition, or capacity of" a navigable river be made unless "the work" has been approved by the Secretary of the Army. There is, apart from these particularized invasions of navigable rivers, which the Secretary of the Army may approve, the generalized first clause which prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity" of such rivers. We can only conclude that Congress planned to ban any type of "obstruction," not merely those specifically made subject to approval by the Secretary of the Army. *In short, the first clause is aimed at protecting "navigable capacity," though it is adversely affected in ways other than those specified in the other clauses.*

\*    \*    \*    \*    \*    \*

Clearly the structures and activities set forth in the second and third clauses need not be shown to obstruct navigable capacity before federal authorization is required by the terms of the statute.

Finally, recent Fifth Circuit authority has established beyond cavil that an alteration or modification of navigable waters is sufficient to trigger the permit requirement of Section 10 of the Rivers and Harbors Act. In *United States v. Joseph G. Moretti, Inc.,* (Moretti I) 478 F.2d 418, 429 n.37 (5th Cir. 1973), the Fifth Circuit held that "any filling of navigable waters creates an obstruction to navigation." When the same party came before the Fifth Circuit again, the court held that to trigger the permit requirements of the third party clause of Section 10, a party need only prove:

factual circumstances showing some effect upon navigable waters, some alteration or modification of either course,

location, condition or capacity of those waters. These statutory terms are broad and undefined. So long as activities fall within this generous scope, those activities are subject to the jurisdiction of the Corps.

*United States v. Joseph G. Moretti, Inc.,* (Moretti II), 526 F.2d 1306, 1309 (5th Cir. 1976); accord, *Weiszmann v. District Engineer, United States Army Corps of Engineers,* 526 F.2d 1302, 1305 (5th Cir. 1976); *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1296–99 (5th Cir. 1976).

*Sierra Club v. Andrus,* 610 F.2d 581, 596–7 (9th Cir. 1979), U.S. appeal pending No. 79–1625.

We are persuaded of the correctness of the Ninth Circuit's analysis, and in light of such analysis, we are compelled to reverse the district court's conclusion that the collapsed dock did not obstruct the navigation of the river. We hold that the collapsed dock, extending 35 feet into the river, constituted an obstruction to the navigable capacity of the navigable water, and therefore constituted an obstruction in violation of Section 10 of the Rivers and Harbors Act. *See also United States v. Raven,* 500 F.2d 728 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124 (1974) (holding that a sunken 83 foot schooner was an obstruction to navigation within the meaning of the Act.)

### V.

Having found a violation of Section 10 of the Rivers and Harbors Act, we move on to consider whether Norfolk & Western, a private party, may maintain a private right of action for damages under the Act. In its memorandum opinion, the district court assumed without deciding that such a private right of action did exist, but finding no obstruction, the district court defeated Norfolk & Western's Section 10 claim on the merits.

In determining whether a statute contains an implied private right of action, four factors should be considered. First, is the plaintiff a member of the class for whose special benefit the statute was enact-

ed? Second, is there any indication of legislative intent, explicit or implicit, either to create or deny a private right of action? Third, do the underlying purposes of the legislative scheme conflict with private enforcement of the Act? And, fourth, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a course of action based solely on Federal law? *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Curran v. Merrill Lynch, Pierce Fenner & Smith*, 622 F.2d 216 (6th Cir. 1980); *Chumney v. Nixon*, 615 F.2d 389 (6th Cir. 1980).

The Ninth Circuit recently applied these factors to Section 10 of the Rivers and Harbors Act and determined that the Act contained an implied private remedy. *Sierra Club v. Andrus*, 610 F.2d 581, 587–592 (9th Cir. 1979), U.S. appeal pending No. 79–1625. In reaching its conclusion, the court stated:

Although we have found no hard and precise indication of a congressional intent to create or deny a private remedy under Section 10, we believe, without significant doubt, that such a remedy does exist. The plaintiffs below are members of a class for whose benefit Congress enacted the statute, and implication of a private remedy is both consistent with the purposes of the Act, and complementary of its enforcement.

\*   \*   \*   \*   \*   \*

... As the District Court succinctly stated, 'Sections 9 and 10 were enacted both to prevent injuries to private parties as a result of obstructions to navigable capacity which were not authorized by the United States and to allow the United States to regulate obstructions to the navigable capacity of its navigable waterways.' 400 F.Supp. at 623.

\*   \*   \*   \*   \*   \*

The district court reasoned that the exclusive enforcement of the criminal provisions should be vested in the Attorney General but that the Attorney General had neither the time nor the resources to seek redress for all violations of the Act. 400 F.Supp. at 624–25. The Court concluded that a private right of action was necessary to protect private parties who suffer special injuries because of these violations. *Id.* at 625. We agree, but we do not rest this conclusion solely upon recognition of the Attorney General's lack of resources. An additional problem, exemplified by this case, is that the federal government, which is specifically directed to enforce the Act, may itself be charged with violating its provisions. Unless private rights of action are permitted, federal violations could operate so as to wholly frustrate the purposes of the Act. *See Illinois ex rel. Scott v. Hoffman*, 425 F.Supp. 71, 75–76 (S.D.Ill. 1977); cf. *Miller v. Mallery*, 410 F.Supp. 1283, 1289 (D.Or.1976).

*Andrus,* at 587–591.

We are persuaded by the rationale presented in the *Andrus* opinion, and for the reasons cited therein, hold that Norfolk & Western had the right to maintain an action against the United States and Dunbar for creating an obstruction to the navigable capacity of the Huron River under Section 10 of the Rivers and Harbors Act. The "special injury" suffered by Norfolk & Western is the risk of loss of trade, as well as the risk of liability for neglecting its duty owed to ships trading at its ore dock to maintain safe berths and safe approaches in the river.

Norfolk & Western sued Dunbar and the United States to recover its expenses of removing the collapsed dock, which amount to $33,133.00. The district court, having found that neither the United States nor Dunbar had caused the collapse of the North Dock, as well as that the debris from the collapse did not "obstruct" the navigation of the Huron River, dismissed Norfolk & Western's claim on the merits.

In affirming the district court's finding that the cause of the dock's collapse was a latent defect in the dock, we implicitly affirmed as well its finding of non–negligence on the part of the defendants–appellees,

Dunbar and the United States. Thus, it would seem to be consistent with such a finding that Dunbar and the United States, not having contributed in any liability–creating way to the collapse of the dock, be exempt from any responsibility for removing the debris created by the dock's collapse. However, we are troubled by this result. While Norfolk & Western, as owner of the collapsed dock, would incur the responsibility for the debris' removal assuming its negligence, such responsibility is less clear when there has been no finding of negligence. See generally *Hines, Inc. v. United States*, 551 F.2d 717 (6th Cir. 1977); *U. S. v. Ohio Barge Lines*, 607 F.2d 624 (3d Cir. 1979).

An instructive case here is *United States v. Perma Paving Co.*, 332 F.2d 754 (2nd Cir. 1964), in which the United States sought to recover costs it had incurred in dredging a shoal from the Bronx River resulting from misuse of riparian property owned by the defendant City of New York and leased from the city by defendant Perma Paving Co. The city sought to escape liability on the ground that it was a landlord out of possession. The court rejected the city's argument, and held it to be jointly and severally liable, along with its lessee, and held that the city was not entitled to indemnity from its lessee. Norfolk as a licensor, as a matter of law, was not out of possession since a license does not grant a possessory interest in land as a lease does. 25 Am.Jur.2d, *Easements and Licenses*, § 123.

We are persuaded that the most equitable resolution to the case at hand is that both parties share in the costs of removal of the debris from the collapsed dock. Accordingly, defendants–appellees, the United States and Dunbar, are to reimburse plaintiff–appellant Norfolk & Western for one–half of the removal expenses incurred by Norfolk & Western.

## VI.

The judgment of the district court is affirmed on the issue of the proximate cause of the dock's collapse, affirmed on the third–party beneficiary issue, and reversed as to Norfolk & Western's implied right of action under Section 10 of the Rivers and Harbors Act. Defendants–appellees are ordered to pay Norfolk & Western in the amount of $16,566.50, representing one–half of the expenses incurred in removing the collapsed dock.