UNITED STATES of America,
Plaintiff,

v.

Grabshawi Kamal EL–SADIG, aka Gabshawi Kamal El–Sadig, Defendant.

No. 1:2000–CR–0520.

United States District Court, N.D. Ohio, Eastern Division.

March 1, 2001.

Geoffrey Simonson Mearns, Thompson, Hine & Flory, Cleveland, OH, for Defendant.

Joseph P. Schmitz, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

## ORDER

GWIN, District Judge.

On February 5, 2001, Defendant Gabshawi Kamal El–Sadig moved this Court to dismiss the indictment against him [Doc. 19]. As grounds for the motion, Defendant El–Sadig says this action is barred by an agreement entered into between Prince Mansour bin Bander bin Abdul Aziz ("Prince Mansour") of Saudi Arabia and the United States government. For the reasons that follow, the Court grants the motion.

I

On December 28, 2000, the grand jury returned a twenty-five count indictment that charges Defendant El–Sadig with making false statements in the acquisition of firearms, aiding and abetting another in making false statements in the acquisition of twenty-five firearms, attempting to export firearms without a license, and conspiring to make false statements in the acquisition of firearms and to export firearms without a license. The indictment centers on acts related to the illegal acquisition of firearms by certain nationals of Saudi Arabia who intended to export the firearms.

The conduct underlying the indictment took place in September 1999. At that time, Prince Bander Abdul Aziz of Saudi Arabia, who is the brother of King Fahed of Saudi Arabia, had come to the United States to receive medical treatment at the Cleveland Clinic. At the time he came to the Cleveland Clinic, Saudi Arabia Prince Bander Abdul Aziz was accompanied by members of the Saudi royal family, including his son, Prince Mansour, and their staff members. The United States alleges that Defendant El–Sadig acted to illegally obtain firearms for two members of this Saudi entourage.

In support of his motion to dismiss, Defendant El–Sadig argues that the United States, at the request of its State Department, entered into an oral agreement whereby the government would not prosecute any of the individuals involved in purchasing the guns if the guns were surrendered to federal law enforcement officers. Mr. El–Sadig says he was one of the beneficiaries of this agreement and that he assisted the surrender of the guns in reliance upon the agreement.

In response, the United States acknowledges that it reached an agreement that it would forego prosecution of the Saudi nationals if the weapons were surrendered. But the United States says it did not agree to forego prosecution of Defendant El-Sadig.

## II

In September 1999, Defendant El-Sadig, a native of the Sudan, lived in the Cleveland, Ohio, area after receiving a L.L.M. degree from Case Western Reserve University School of Law. After receiving the degree, he worked odd jobs while looking for full-time legal employment. Near this time, Defendant El-Sadig was asked to serve as a driver for Prince Bander Abdul Aziz ("Prince Bander") while he stayed at the Cleveland Clinic. Defendant El-Sadig speaks Arabic and could communicate with members of the Saudi group.

While Prince Bander received treatment at the Cleveland Clinic, his entourage stayed at the Omni International Hotel, occupying several floors. El-Sadig provided transportation and ran errands for the Saudi royal family and their staff.

While Defendant El-Sadig worked as a driver to Prince Bander's group, members of the Saudi royal family's staff asked him to assist them in purchasing guns. Defendant El-Sadig says Saudi visitors Muneef Al-Ghatani and Fahed Al-Ghatani made this request. In response to this alleged request, El-Sadig purchased guns from a store called Pistol Pete's in Chesterland, Ohio. In making these purchases, Defendant El-Sadig allegedly failed to identify visitors Muneef Al-Ghatani and Fahed Al-Ghatani as the real purchasers.

Several days after the first purchase, Saudi national Fahed Al-Ghatani asked El-Sadig to buy more guns. Defendant El-Sadig says he refused. Defendant El-Sadig says Fahed Al-Ghatani found another driver, Craig Michalovich, who was will-ing to make the purchases. Defendant El-Sadig acknowledges going with Fahed Al-Ghatani and Michalovich to a gun shop at a Wal-Mart store in Medina, Ohio. Apparently, Michalovich purchased three hunting rifles for Fahed Al-Ghatani at the store. After returning to the Omni Hotel, Mr. Al-Ghatani took the guns into the hotel.

On September 27, 1999, agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") learned that Defendant El-Sadig had recently purchased more than twenty firearms from Pistol Pete's. In purchasing the firearms, El-Sadig presented an Ohio drivers license, completed forms [1] and represented that he was the "actual buyer" of the firearms. The ATF agents investigating the purchase, however, believed two individuals of Middle Eastern descent who accompanied El-Sadig to the gun store were the actual purchasers of the firearms.

After further investigations, the ATF agents believed the actual purchasers of the firearms were part of the foreign entourage which accompanied Prince Bander. The ATF agents also learned the Saudi group was scheduled to depart the area, and leave the United States on the afternoon of October 2, 1999. Investigative agents believed that the two unidentified members of the entourage would likely arrange for the firearms and ammunition to be transported to a commercial or private plane at that time, and that the items would then be exported from the United States, in violation of this country's export laws.

On October 1, 1999, the day before Prince Bander and the Saudi royal family were scheduled to depart the United States, William Kissinger of the United States Department of State spoke separately to John Morton, the Special Assistant and Counsel to the Deputy Attorney General of the United States, Lisa Burnett, an Associate Director of the Office of International Affairs, Criminal Division, of

---

1. ATF Form 4473's.

the United States Department of Justice, and Gregory Sassé, an Assistant United States Attorney ("AUSA") for the Northern District of Ohio. Through the course of these conversations it was agreed that Kissinger would contact the Saudi Arabian embassy to request assistance in recovering the guns before the Saudi entourage left the country. Kissinger asked Allen Keiswetter, the State Department official responsible for Saudi Arabia, to contact the Saudi Arabian embassy and deliver a message Sassé and Kissinger had agreed upon.

Keiswetter spoke to Ahmed Kattan, Deputy Chief of Mission at the Royal Embassy of the Kingdom of Saudi Arabia in Washington, D.C. Deputy Chief Kattan then called Prince Mansour and informed him of the situation regarding the guns. Both Deputy Chief Kattan and Prince Mansour were under the impression that the United States government was interested in resolving the matter quickly and discreetly so that if the guns were surrendered, there would be no prosecution of any of the individuals involved.[2]

At this time, Prince Mansour had contact with Cleveland Clinic Police Chief Thomas F. Jones. Before becoming a Police Chief for the Cleveland Clinic, Jones served as a special agent for the FBI for 27 years. On the evening of October 1, 1999, Chief Jones met Prince Mansour at Morton's Restaurant in Cleveland. Prince Mansour told Chief Jones that he understood that there would be no arrests if the illegally obtained firearms were turned over to the ATF. Chief Jones testified to the conversation he had with Prince Mansour:

**2.** Deputy Chief Kattan, testified that he was told that if all guns and ammunition could be surrendered to Chief Jones, the matter would be closed. From Kissinger's statement, Ambassador Kattan understood that no charges would be brought against any of those involved in the incident:

> I was surprised to learn that the United States government had arrested Mr. El-Sadig recently and decided to prosecute,

Q Going back now to the dinner table at Morton's, what else did Prince Mansour say at that time?

A Basically, he related to me a conversation he had with Bill Kissinger, and apparently they had worked out an agreement that if these weapons that were in the Omni Hotel were turned over to me as the chief of police, that the matter would be finished.

Thomas F. Jones's February 20, 2001, testimony (hereinafter "Jones's transcript") at 29.

Prince Mansour then asked Chief Jones to confirm this understanding with State Department Attorney Kissinger. Jones agreed and called Kissinger. Jones described his conversation with Kissinger:

Q Okay. Prince Mansour then asked you to call Mr. Kissinger?

A Yes. I went outside and I did call Mr. Kissinger, and basically he related that same conversation to me that he had with Prince Mansour.

Q Okay. Tell me about your conversation with Mr. Kissinger, to the best that you can recall.

A Basically, it had—he had related to me that he was aware of the types and number of weapons that had been purchased for the Saudis. He indicated that he had been in contact with the Saudi Embassy. He had also been in contact with the Justice Department, and that an agreement was worked out that if—if all of those weapons were turned over to me as the chief of police for the Cleveland' Clinic, and I turned those weapons

having understood that the matter would be closed. I was not informed by the State Department that the Department of Justice intends to reserve its right to prosecute one or more individual involved in the incident. My understanding was that the matter would be closed for all upon surrender of guns and ammunition.

Kattan Affidavit at ¶ 9.

over to U.S. Customs and ATF, that the matter would be closed.

Q Were those Mr. Kissinger's words, the matter would be closed?

A I believe that's what he said, something to that effect.

Q And those were similar to the words that were used by Prince Mansour in describing the arrangement as he understood it?

A That's correct.

Jones's transcript at 31.

Q During that initial conversation with Mr. Kissinger, did he indicate to you that anybody was excluded from the arrangement that he was discussing with you?

A He did not discuss any individuals at all. The only thing that we discussed is that if the weapons were turned over to me as the chief of police and I turned those weapons over to ATF and Customs, that the matter would be closed.

Jones's transcript at 35. Chief Jones prepared a contemporaneous note confirming this conversation.[3]

While Kissinger told Chief Jones that the "matter would be closed," he did not specifically say that Defendant El–Sadig would not be prosecuted.[4]

As a former FBI agent for 27 years, Chief Jones testified that the phrase "matter would be closed" indicated none involved in the firearms offense would be prosecuted if the weapons were returned:

**3.** In a note dated October 2, 1999, Chief Jones recorded:
"William Kissinger, General Counsel's office, U.S. Department of State, Washington, D.C. (202) 362–8060 advised this writer that assurances from Deputy Attorney General, Eric Holder, U.S. Department of Justice were given to the effect no prosecution would ensue if all the weapons purchased in Cleveland, Ohio for the use/purpose of turning over to another were recovered and turned over to federal law enforcement."

**4.** Chief Jones testified:

Q And by "matter," you did not understand that to mean a potential prosecution of some of the people involved, correct?

A No, it doesn't—it doesn't delineate at all other than the entire situation in toto is closed.

Q And—

A And there is no specific breakdown as to individuals who may or may not been involved.

Q You had 27 years in the FBI, correct?

A Yes.

Q And "matter" can be a term of art in law enforcement?

A Yes.

Q And "matter" means a potential prosecution of anybody involved, correct, is that your understanding?

A That's correct.

Jones's transcript at 90–91.

Kissinger does not dispute the central portion of Chief Jones's recollection. In an October 4, 1999, memorandum, Kissinger gave his recollection of the conversation two days prior:

"... During my conversation with him [Chief Jones], I noted that State had consulted with Justice, and Justice decided that so long as the firearms and ammunition were surrendered to U.S. law enforcement, that would end the matter. This was the message that I had received from Lisa Burnett in the International Affairs Office within the Criminal Division and which was, in

Q So you assumed from what was told to you that it included anyone and everyone, is that correct, your understanding?

A That was my understanding, that nothing—there would be no further action with regard to this matter, that was my understanding.

Q All right. But you came to that conclusion without any specific discussion of Mr. El–Sadig; is that correct?

A That's correct.

Jones' testimony at 82.

turn, the message she indicated she had received from Greg Sasse, the AUSA handling the investigation. I told Jones that consultations within Justice on this issue had gone as far as Deputy Eric Holder's office."

While similarly describing his conversation and representations, Kissinger says he used the phrase that the return of the weapons "would end the matter" but did not say the "matter would be closed." No one told Prince Mansour or Chief Jones that the United States was leaving open the possibility of prosecuting Defendant El–Sadig.

After Chief Jones spoke to Kissinger from the restaurant, Prince Mansour agreed to resolve the matter to avoid embarrassment to the Saudi royal family and to avoid any publicity about the incident. Chief Jones was told to coordinate the recovery of the guns.

After Prince Mansour and Chief Jones spoke with State Department Attorney Kissinger, they returned to the Omni Hotel. At the time they returned to the hotel, Prince Mansour and Jones had information that Defendant El–Sadig had assisted persons with the Saudi entourage but they did not know which Saudi nationals.

Prince Mansour summoned Defendant El–Sadig to a meeting in a suite at the Omni Hotel. After El–Sadig came to the suite, Prince Mansour spoke to him in Arabic. At first, he asked El–Sadig who in the entourage had the weapons. Defendant El–Sadig appeared frightened and began backing away from Prince Mansour. The Prince then told Defendant El–Sadig that if he did not identify the party members who had the weapons, he would turn Defendant El–Sadig over to Chief Jones to be arrested. Defendant El–Sadig relates that Prince Mansour also "assured me that the matter would be 'closed' if I helped to recover the guns. Prince Mansour further stated that the government had promised that nothing would happen to me if I cooperated." Prince Mansour's testimony does not support El–Sadig's recollection. He does not recall informing Defendant El–Sadig of the arrangements made between the Saudi Arabian Embassy and the State' Department. Nevertheless, Prince Mansour testified he had intended to benefit El–Sadig with the agreement:

In fact, I had asked Chief Jones earlier that night to make sure Mr. El–Sadig is also included in the agreement. He promised me he would try.

Prince Mansour's Affidavit at ¶ 14.

Defendant El–Sadig then told Prince Mansour the names of the Saudi nationals who had the weapons. Those members of the entourage were summoned to meet with Prince Mansour. They then turned the weapons over to Chief Jones who then turned the weapons over to the ATF.

### III

"Plea agreements are contractual in nature. In interpreting and enforcing them, we are to use traditional principles of contract law." *United States v. Robison,* 924 F.2d 612, 613 (6th Cir.1991); *see also In Re: Extradition of Drayer,* 190 F.3d 410, 412 (6th Cir.1999).

In *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the Supreme Court held that when the government makes promises to a defendant who relies on those promises and pleads guilty, the government must carry out its representations. Cooperation agreements are analogous to plea bargain agreements. *United States v. Streebing,* 987 F.2d 368, 372 (6th Cir.1993). Several circuits, including the United States Court of Appeals for the Sixth Circuit, have acknowledged that the principles of *Santobello* apply whenever a defendant acts to his detriment in reliance upon governmental promises. *Id.* (collecting cases).

"[A]s a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected." *Id.* (quoting *Johnson v.*

*Lumpkin,* 769 F.2d 630, 633 (9th Cir. 1985)). This rule is subject to two conditions: (1) the agent must be authorized to make the promise; and (2) the defendant must rely to his detriment on the promise. *Streebing,* 987 F.2d at 372

Several Circuits have held that actual authority is needed to bind the government during plea bargaining or analogous contexts. *United States v. Flemmi,* 225 F.3d 78, 84 (1st Cir.2000) (stating "a defendant who seeks specifically to enforce a promise, whether contained in a plea agreement or a freestanding cooperation agreement, must show ... that the promisor had actual authority to make the particular promise"); *Thomas,* 35 F.3d at 1338 ("Estoppel and apparent authority normally will not substitute for actual authority to bind the United States government."); *San Pedro v. United States,* 79 F.3d 1065, 1068 (11th Cir.1996) (quoting *Thomas,* 35 F.3d at 1338).

■ However, the law of the Sixth Circuit is not as clear. Language in previous Sixth Circuit decisions implies an agent with apparent authority can bind the government in cooperation agreement and plea bargain contexts. *See Peavy v. United States,* 31 F.3d 1341, 1347 (6th Cir.1994) (stating "the court must determine whether the agents had the *apparent authority* to make the disputed promises on behalf of the government, taking into account the secrecy of [the defendant's] cooperation agreement, and whether [the defendant] relied to his detriment on the promises"); *Streebing,* 987 F.2d at 373 (stating "because the FBI agent lacked any actual or *apparent authority* to make the alleged promise not to prosecute, the District Court did not err in failing to dismiss the indictment"). However, the Court does not reach the issue of what authority a government agent needs to make a binding promise because it is clear that Kissinger had actual authority to communicate the terms of the non-prosecution agreement to the Saudi Arabian embassy and Chief Jones.

In *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859 (7th Cir.1998), the court succinctly summarized the principles of agency relevant to this case:

> An agent's authority may be actual or apparent, *see generally* Restatement (Second) of Agency §§ 7–8; if it is actual, it may be express or implied, *see id.* § 7 cmt. c. Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence. Actual authority "to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* § 26. In contrast, "apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. In other words, apparent authority is created by the same method as that which creates actual authority, except that the manifestation of the principal is to the third person rather than to the agent.

155 F.3d at 866–66.

Kissinger was an agent of the United States Attorney's Office and the Department of Justice. His testimony establishes that on October 1, 1999, he spoke with Special Assistant Morton, Associate Director Burnett and AUSA Sassé. All four agreed that Kissinger would be responsible for communicating the terms of the agreement to the Saudi entourage. That evening, AUSA Sassé and Kissinger, working together, finalized the message communicated to the Saudi Arabian embassy. Kissinger was clearly working as the agent of the United States Attorney's Office.

Therefore, when Kissinger spoke to Chief Jones at the behest of Prince Mans-

our, Kissinger was still acting as the agent of the United States Attorney's Office. He had been authorized to communicate the terms of the non-prosecution agreement to the entourage. Any promises he made, he made as an actual agent of the United States Attorney's Office.

The United States argues that El–Sadig is not covered by the non-prosecution agreement because Kissinger was not authorized to extend him immunity. *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 352 (6th Cir.1986) ("The government is not bound by unauthorized acts of its agents."). In turn, *Jones & Laughlin* relies upon Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In *Federal Crop,* an agent of a corporation created by the Federal Crop Insurance Act advised the respondents that their entire wheat crop was insurable. In fact, express provisions of the Wheat Crop Insurance Regulations, published in the Federal Register, barred recovery for their crop. When the crop was destroyed by drought, the corporation refused to pay for the loss. The Supreme Court held that the corporation was not obligated to pay for the loss of the crops:

> ... anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

332 U.S. at 384, 68 S.Ct. 1.

Federal law vests United States Attorneys with the power to prosecute offenses in their district. 28 U.S.C. § 547(1). The power to prosecute also includes the power not to prosecute or to give promises of immunity. *Flemmi,* 225 F.3d at 87. The government asserts that the power not to prosecute is only reserved for United States Attorneys or their authorized delegates, not any other official. In support of this argument, the government cites numerous cases where promises by officials or law enforcement officers other than federal prosecuting attorneys were not honored. *See* Government's Opposition to Motion at 13–15.

The United States argues that Kissinger was not authorized by statute to make El–Sadig a promise of immunity nor was he given that authority by AUSA Sassé, Associate Director Bennett, or Special Assistant Morton. Kissinger was only authorized to confer the terms of the agreement. Any deviation from the terms of the agreement would exceed his actual authority. Therefore, the promise was unauthorized and cannot bind the government.

█ "The government may be bound by an unauthorized agreement if a properly authorized official subsequently ratifies it." *United States v. Flemmi,* 225 F.3d 78, 90 (1st Cir.2000); *see also Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1433 (Fed.Cir.1998). Implied ratification occurs when the ratifying official has actual or constructive knowledge of the agreement and fails to timely repudiate it. *Harbert/Lummus,* 142 F.3d at 1433 (citing *United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901)).

Police Chief Jones testified credibly that AUSA Sassé confirmed virtually the same agreement Kissinger had described to Jones, that if the guns were turned in, there would be no prosecution:

Q Did you speak with any Assistant United States Attorneys here in the Northern District?

A Greg Sassé.

Q Did you speak to him on October 1st or October 2nd?

A I may have spoken with him sometime during that 24–hour period.

Q What do you recall about your conversation with [AUSA] Mr. Sassé?

A I think my notes reflect what he had told me. Just that conversation had to do with *the matter was going to be closed.* My notes on the date of the 2nd indicated that AUSA Sassé advised *matter is closed, no further inquiry or follow-up* with individuals or check with the Department of Justice if necessary. That's—and there was some discussion about whether Customs was going to allow the Saudis to fly their plane, I think that was on—my notes indicate that Customs request was refused and it was not necessary.

Q So in addition to speaking to Mr. Kissinger, your recollection is you spoke with Mr. Sassé?

A Yes.

Q And Mr. Sassé confirmed if the guns were returned, the matter would be closed?

A *He just advised the matter was closed,* because the guns were already in the hands of Customs and ATF at the point I spoke with AUSA Sassé.

Q In that conversation with Mr. Sassé, did he indicate that certain individuals, by either name or by characterization, were or were not covered by this?

A No, there were no—no names mentioned, no specific individuals mentioned.

Q And no specific individuals mentioned as being excluded?

A There were *no* names mentioned at all.

Q That it was a categoric statement that the matter was closed?

A That the matter was closed. That's right. In talking with Mr. Kissinger, it was my understanding that they wanted to keep this as very low key as possible, so that it would not cause any embarrassment to the royal family, Saudi royal family. And that was the purpose for the—

Jones's transcript at 47–48 (emphasis added).

 Kissinger was authorized to communicate the agreement to the Saudi Arabian embassy and Chief Jones. While the Court acknowledges that there is a dispute whether Kissinger was authorized to communicate the terms of the agreement in the manner that he did, the resolution of that question is not important to the Court's decision. The Court holds that AUSA Sassé's conversation with Chief Jones on the morning of October 2, 1999, ratifies the non-prosecution agreement with respect to El–Sadig.

 Furthermore, even if the non-prosecution agreement was never directly communicated to Defendant El–Sadig, he can enforce the non-prosecution agreement as a third party beneficiary. Federal courts look to general principles of contract law to interpret a plea or immunity agreement. *United States v. Given,* 164 F.3d 389, 395–96 (7th Cir.1999). To create a third party beneficiary, the contract must reflect an express or implied intention to benefit the third party. Restatement (Second) of Contracts § 302 (1979);[5] *Montana v. United States,* 124 F.3d 1269, 1273 (Fed. Cir.1997); *see also Parker v. United States Dept. of Agric.,* 879 F.2d 1362 (6th Cir. 1989). In *Norfolk & Western Co. v. Unit-*

**5.** Section 302 of the Restatement states:

(1) *Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either:*

(a) the performance of the promise will satisfy an obligation of the promisee to pay more money to the beneficiary; or
(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*ed States,* 641 F.2d 1201 (6th Cir.1980), the Sixth Circuit, applying Ohio law, utilized an "intent to benefit" test to determine if a party was an intended beneficiary:

> Under this analysis, if the promisee ... intends that a third party should benefit from the contract, then that third party is an "intended beneficiary" who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an "incidental beneficiary," who has no enforceable rights under the contract.

*Norfolk & Western,* 641 F.2d at 1208. An intended beneficiary does not need to be named in the contract but must belong to a class intended to be benefitted. *Montana,* 124 F.3d at 1273.

In entering the agreement to secure the guns for the ATF, Promisee Prince Mansour was most concerned with avoiding embarrassing publicity for his father. To similar effect, Kissinger sought, on behalf the United States, to avoid publicity. Chief Jones testified:

Q That it was a categoric statement that the matter was closed?

A That the matter was closed. That's right. In talking with Mr. Kissinger, it was my understanding that they wanted to keep this as very low key as possible, so that it would not cause any embarrassment to the royal family,· Saudi royal family. And that was the purpose for the—

Q The reason the United States government was willing to—

A That's right.

Jones's transcript at 48.

Prince Mansour had no personal relationship with Defendant El–Sadig. If anything, El–Sadig's acts in assisting the Saudi nationals obtain firearms angered Prince Mansour. Similarly, there is no evidence that Prince Mansour had any special interest in protecting Muneef Al–Ghatani and Fahed Al–Ghatani, the two Saudi nationals involved. In this case,

Prince Mansour obviously wanted to benefit all persons associated with the Saudi delegation. If any of the involved persons were prosecuted, Prince Mansour's benefit would disappear because the knowledge that Saudi nationals illegally purchased guns would become public. This publicity would be embarrassing to the Saudi royal family and was the reason Prince Mansour entered into the non-prosecution agreement. Because Prince Mansour was not involved in any of the illegal activity, his efforts to obtain a commitment not to prosecute were obviously intended by him to benefit third-parties.

Defendant El–Sadig, as a third-party beneficiary, has standing to enforce the agreement not to prosecute. The United States has the power to forego prosecution in consideration of the promise of another, including a promise to plead guilty. *United States v. Clements,* 992 F.2d 417, 419 (2d Cir.1993) (citing *Bordenkircher v. Hayes,* 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 54 L.Ed.2d 604) ("[I]t is now clearly established in the Second Circuit that the government may impose conditions which relate to the conduct or treatment of others.").

■ While acknowledging Kissinger's statements to Chief Jones can be construed to stop all prosecution, the United States says that the statements should be given a narrow construction. This argument leads to two problems. First, Kissinger's statement that "that the matter would be closed" is difficult to understand as implying a right to continue the matter. Second, the government, as announcer of the agreement, "ordinarily must bear responsibility for any lack of clarity" in the agreement. *See United States v. Johnston,* 199 F.3d 1015, 1020 (9th Cir.1999) (plea agreement to be construed against the government); *United States v. Johnson,* 979 F.2d 396, 399 (6th Cir.1992) (the government is held to a greater degree of responsibility than the defendant for imprecisions and ambiguities in plea agree-

ments); *Thomas v. Immigration and Naturalization Service,* 35 F.3d 1332, 1337 (9th Cir.1994) ("The government is held to the literal terms of the agreement, and ordinarily must bear responsibility for any lack of clarity."); *United States v. McBride,* 571 F.Supp. 596, 605 (S.D.Tex. 1983) (ambiguity in government's agreement with defendant not to prosecute codefendant in exchange for defendant's cooperation in connection with the location and disarming of explosive devices would be construed against the Government, which drafted it).

The Court finds that Defendant El–Sadig is a third-party beneficiary of the contract not-to-prosecute of the United States and Saudi Arabia's ambassador. Any ambiguity regarding the scope of that agreement should be construed against the United States. Finding that the United States agreed that "that the matter would be closed" upon the conveyance of the firearms to the ATF, the Court finds that this agreement forecloses prosecution of Defendant El–Sadig. The Court grants the defendant's motion to dismiss.

IT IS SO ORDERED