BROOKESIDE AMBULANCE, INC. d.b.a. Rumpf Ambulance Service, Appellant,

v.

WALKER AMBULANCE SERVICE, Appellee.

[Cite as *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.* (1996), 112 Ohio App.3d 150.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–95–096.

Decided June 28, 1996.

*William R. Lindsley* and *Robert V. Seymour,* for appellant.

*George E. Leonard* and *Charles Bloom,* for appellee.

HANDWORK, Judge.

This case is on appeal from the March 9, 1995 judgment of the Lucas County Court of Common Pleas, which granted a directed verdict to appellee, Walker Ambulance Service ("Walker"). On appeal, appellant, Brookeside Ambulance Service, Inc., d.b.a. Rumpf Ambulance Service ("Brookeside"), asserts the following assignments of error:

"I. Trial court erred by striking the testimony of plaintiff's expert witness, James Weber, CPA, with respect to plaintiff's damage.

"II. Trial court erred by granting defendant's motion for directed verdict with respect to plaintiff's claim of tortious interference."

Brookeside sued Walker, asserting in its complaint that Walker, with an intent to appropriate Brookeside's business, tortiously interfered with Brookeside's business contracts, business relationships, and economic expectancies.

With respect to its relationship with REMSNO (Lucas County's emergency medical dispatch organization that is now known as Lucas County EMS), Brookeside introduced the following evidence at trial relating to Walker's alleged actions of run jumping, improperly (under the county dispatch system rules) using day cars for emergency medical transportation, and opening short-term stations next to Brookeside for the sole purpose of cutting off its income.

Several witnesses testified as to the requirements under REMSNO rules regarding dispatching. According to them, REMSNO, now known as Lucas County EMS, dispatches a first responder to the scene of an accident following a 911 call. The first responder, i.e., the fire department rescue squad, assesses the patient and decides if a life-threatening situation exists. If immediate transportation is not necessary, the first responder contacts the dispatcher and requests a private ambulance to transport the patient to the hospital. REMSNO contacts the private ambulance service closest to the scene and asks if it has a car in service. If it does not, the next nearest ambulance service is contacted. Under the REMSNO contract, the ambulance service is required to respond truthfully. Responding falsely and sending a car from another station is known as "run jumping." Even after REMSNO ceased to exist on December 31, 1991, the ambulance companies agreed to operate under the REMSNO contract. Lucas County EMS continued to operate under the same dispatch system.

Brookeside was incorporated in 1991 to provide basic life support services (non-life-threatening transportation). Donald Kish, Brookeside's president, estimated that in the summer of 1991, ninety-eight percent of Brookeside's runs were initiated by 911 calls. The company began with one station and later that year opened a second station, both located in heavy traffic areas that were not close to any competitor stations. Shortly after the second station was opened, Walker opened two new stations close to Brookeside's stations, thereby cutting Brookeside's response area in half. Walker closed these two stations shortly after Brookeside closed its stations. One of Walker's emergency medical technicians testified that she never saw a night shift enter when she left at midnight from one of these stations. She did not know if the station was open twenty-four hours a day or not. However, at all the other stations, she would see the relief crew entering as she departed. The owner of an ambulance station located near one of Brookeside's testified that Gary Walker contacted him in the fall of 1991 about renting the station but rejected the owner's offer to sell the property. Kish calculated that Brookeside lost six hundred seventy-eight runs due to Walker's blocking stations.

There was some evidence presented that the telephone company had incorrectly listed Brookeside's telephone number in its directory. However, witnesses testified that arrangements had been made for the forwarding of all calls and that REMSNO, the hospitals, and nursing homes were aware of the correct number. Furthermore, there was evidence that Brookeside did not have a twenty-four-hour dispatcher and that it did not have an answering service until the summer of 1991. A REMSNO dispatcher testified that he could recall not being able to get through to Brookeside.

Two former dispatchers for Walker testified that Walker instructed them to keep track of anything that interfered with Walker taking a run, including the fact that Brookeside took the run. One dispatcher testified that he never falsely indicated to a REMSNO dispatcher that a car was in service when it was not and was not aware of any other Walker dispatcher having done so. However, an emergency medical technician for Walker testified that she had participated in run jumps.

Kish calculated that Walker improperly jumped one thousand seventy-seven runs that would have gone to Brookeside and that the run jumping caused them to lose a considerable amount of profit. However, his calculations were based in part on the log records of Walker. A Walker dispatcher testified that these records were not updated daily to show whether the car dispatched had been moved from the station where it began the day. Consequently, he believed that the records sometimes incorrectly indicated the station from which the car was dispatched.

Kish further calculated that Walker's action of improperly using day cars caused Brookeside to lose 1,702 runs. Kish interpreted the REMSNO contract as requiring that the ambulance services use a "24–hour car" (one that is in service twenty-four hours a day, seven days a week, fifty-two weeks a year) for emergency calls. However, other witnesses testified that all the ambulance services, including Brookeside, used their day cars (cars not in service one hundred percent of the time) for such purposes.

Kish complained to REMSNO, but no action was ever taken against Walker. A REMSNO director testified that he had received a similar complaint from the Toledo Fire Department against Walker.

With respect to Brookeside's claim that Walker attempted to persuade certain nursing homes and hospitals to use its services rather than Brookeside's, Brookeside introduced the following evidence:

Kish testified that his business with Golden Haven Nursing Home ended abruptly. A charge nurse at the nursing home testified that she always used Brookeside but discontinued doing so after meeting with her supervisor. An

employee of Riverside Hospital testified that Villa North Nursing Home attempted to persuade Riverside to use only Walker for transporting its patients, but dropped the issue after Riverside indicated that it had an exclusive contract with Brookeside. The president of Riverside testified that Walker attempted to reopen negotiations for discounted service after the contract with Brookeside had been executed.

Finally, Brookeside alleged that Walker discouraged investment in Brookeside and defamed Brookeside personnel to cause people not to want to use Brookeside. However, there was no evidence presented to prove this claim.

Brookeside presented expert testimony on damages. A question was raised as to the witness's qualification to testify. After Brookeside closed its case, the trial court granted Walker's motion to strike the expert's testimony and directed a verdict in Walker's favor on the ground that there was no evidence of a tortious interference and no evidence of damages.

We begin by addressing Brookeside's second assignment of error. Brookeside argues that the court erred by granting a directed verdict in Walker's favor.

When ruling on a motion for directed verdict, the court must construe the evidence most strongly in favor of the party against whom the motion is directed and grant it only if reasonable minds could only conclude that the movant is entitled to judgment under the applicable law. Civ.R. 50(A)(4); *The Limited Stores, Inc. v. Pan Am. World Airways, Inc.* (1992), 65 Ohio St.3d 66, 73, 600 N.E.2d 1027, 1033–1034. The court does not weigh the evidence or determine the credibility of the witnesses when ruling on the motion. *Sharp v. Norfolk & W. Ry. Co.* (1995), 72 Ohio St.3d 307, 649 N.E.2d 1219.

The tort of interference with a contractual relationship was first recognized by the Ohio Supreme Court in *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863. In that case, the court adopted the definition of the tort found in 4 Restatement of the Law 2d, Torts (1979) 7, Section 766:

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

In another case that same year, the court expanded the tort to include business relationships as well as contracts. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 651 N.E.2d 1283. From these two cases, we derive the elements of the tort: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relation-

ship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *Id.* at 14, 651 N.E.2d at 1294; *Kenty, supra.* See, also, *Khosla v. Magruder Mem. Hosp.* (June 30, 1993), Ottawa App. No. 92–OT–053, unreported, 1993 WL 306570.

■ Two appellate courts have also adopted 4 Restatement of the Law 2d, Torts (1979) 26, Section 767, which sets forth the factors that should be considered when determining whether the alleged wrongdoer's conduct was improper. *Miller v. Pennitech Indus. Tools, Inc.* (Apr. 19, 1995), Medina App. No. 2356–M, unreported, 1995 WL 230894 (updating its earlier decision in *Juhasz v. Quik Shops, Inc.* [1977], 55 Ohio App.2d 51, 57, 9 O.O.3d 216, 219–220, 379 N.E.2d 235, 238–239), and *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 539, 602 N.E.2d 1219, 1225–1226 (adopting 4 Restatement of the Law, Torts [1939] 63, Section 767, adding only the actor's motive to the list of factors, but not the factor of "the proximity or remoteness of the actor's conduct to the interference" as was done in the second Restatement). The factors to be weighed to determine if an actor's conduct was improper include:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interests of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference and

"(g) the relations between the parties." 4 Restatement of the Law 2d, Torts (1979) 26–27, Section 767.

Section 768 of the Restatement is a special application of Section 767. 4 Restatement of the Law 2d, Torts (1979) 40, Section 768, Comment *b.* This section applies if the trier of fact must determine whether a competitor's conduct was improper. Section 768 provides as follows:

"(1) One who intentionally causes a third person not to enter a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

"(d) his purpose is at least in part to advance his interest in competing with the other.

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." 4 Restatement of the Law 2d, Torts (1979) 39, Section 768.

Walker argued in this case that Section 768 is applicable and that Walker's actions were justified as acts of competition. The trial court agreed and directed a verdict in Walker's favor on the basis that there was no evidence of any illegal or independently actionable conduct on Walker's part.

■ We disagree with Walker's premise that it is a competitor of Brookeside and, therefore, that Section 768 is applicable in this case. REMSNO and Lucas County EMS exist for the benefit of the persons who need emergency medical services and transportation. By contracting with each ambulance company and dictating a systematic procedure for dispatching emergency ambulances, REMSNO was attempting to eliminate competition between ambulance companies. REMSNO's ultimate goal is to get an ambulance to the emergency scene as quickly as possible. Each ambulance company agrees to operate under this system. Therefore, whether Walker's actions were improper is a question for the trier of fact to determine after it balances the factors set forth in Section 767 of the Restatement.

Admittedly, there was some question presented as to the accuracy of the calculation of the run jumps because the details in Walker's log runs may not have been accurately recorded. However, the determination of the credibility of these witnesses and the weight to give the evidence is a matter for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

Accordingly, Brookeside's second assignment of error is well taken.

In its first assignment of error, Brookeside argues that the trial court erred by striking the testimony of its expert on lost profits suffered because of the alleged tortious conduct of Walker. First, Brookeside argues that the trial court abused its discretion by finding that the amount of its damages had not been proven with reasonable certainty. Second, Brookeside argues that the trial court abused its discretion because it initially ruled that the expert could testify and then granted Walker's motion to strike the expert's testimony after he testified.

■ In an action for tortious interference with business contracts, a plaintiff may recover all damages proximately caused by the tortfeasor's misconduct.

*Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.* (1992), 81 Ohio App.3d 591, 599, 611 N.E.2d 955, 960–961; and *Davison Fuel & Dock Co. v. Pickands Mather & Co.* (1977), 54 Ohio App.2d 177, 181–182, 8 O.O.3d 324, 326–328, 376 N.E.2d 965, 967–968. Such damages include lost profits (reduced by the expenditures saved by not having to produce that profit) if both the existence of the loss and the dollar amount of the loss are proven to a reasonable certainty. *Gahanna v. Eastgate Properties* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, paragraph one of the syllabus; *Digital & Analog Design Corp. v. N. Supply Co.* (1989), 44 Ohio St.3d 36, 40, 540 N.E.2d 1358, 1362–1363; and *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.* (1949), 151 Ohio St. 522, 526, 39 O.O. 330, 332, 86 N.E.2d 782, 784. Lost profit damages must be measured by the loss sustained by the plaintiff's business and not by its effect upon defendant's business. *Developers Three v. Nationwide Ins. Co.* (1990), 64 Ohio App.3d 794, 803, 582 N.E.2d 1130, 1136–1137.

The trial court has the discretionary power to determine whether an expert's calculation of lost profits is too speculative. *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 526, 639 N.E.2d 771, 782–783. Therefore, the trial court's decision will not be reversed on appeal unless an abuse of discretion is shown. *Id.* A plaintiff must prove any lost profit figure by calculations based on facts. A mere assertion that he would have made a particular amount in profits is not sufficient. *Gahanna, supra,* 36 Ohio St.3d at 68, 521 N.E.2d at 817–818. However, courts have generally required greater certainty in proof of damages for breach of contract than for tort. *Homes by Calkins, Inc. v. Fisher* (1993), 92 Ohio App.3d 262, 269, 634 N.E.2d 1039, 1043–1044. The expert may rely upon facts derived from his own investigation or the facts in evidence. Evid.R. 703; *State v. Jones* (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526, syllabus.

At trial, Brookeside called James Weber, C.P.A., to testify regarding its damages suffered because of Walker's alleged tortious conduct. Weber testified that he is a certified public accountant and managing partner of the accounting firm of Weber & Company. He stated that his area of expertise is management consulting and litigation support, which includes preparing profit studies and making profit projections. Weber testified that he is familiar with the Brookeside operation as its C.P.A. and reviewed the financial statements of Walker for purposes of this litigation. In making his calculations, he stated, he consulted outside services that compile data on ambulance companies, but he has never worked for another ambulance company. One service that Weber consulted was Robert Morris & Associates. Weber testified that this company obtains various historical information from banks throughout the country and compiles the information into a book by codes. The type of information available for a

particular type of company would be gross revenue, assets, liabilities, compensation as a percentage of sales, net profit as a percentage of sales, net profits, percentage of assets, etc. Within the publication is a section for ambulances and other travel-related services of various sizes. Weber used the Robert Morris & Associates information as a check on his own calculations to learn if his calculations were reasonable. He also talked with Kish and Dan Deeter of Brookeside. Weber acknowledged that he relied upon Kish's calculation of the number of run jumps and the average charges for runs based upon a sampling of bills for the period. But Weber also testified that he compared the financial statements, leases, and tax returns of the two companies, reviewed the run logs and Brookeside's billing records, and contacted a company that sells ambulances regarding certain costs.

Weber calculated Brookeside's damages as of September 29, 1994 for 1991, 1992, and 1993. Weber calculated the total run potential and revenue lost due to the run jumps, blocking maneuvers, and Walker runs with day cars. He also calculated the average collected charges and a net revenue per run. Weber was not provided with incidental costs associated with handling additional runs: postage, envelopes, etc. needed for additional billings. However, he believed that these costs were minimal.

In conclusion, Weber testified that the gross profit that Brookeside would have made if Walker had not interfered with Brookeside's runs was $394,921.

Weber also projected the growth and the resulting profits that Brookeside would have experienced if they had received the profits lost because of Walker's alleged actions and been able to keep their stations open and expand their business. His determination of how many additional months a particular station would have been open was based in part upon information supplied by Kish and the leases of the corporation. Weber verified that Brookeside would not have to hire additional crews to make runs. In conclusion, Weber calculated that Brookeside would have generated an additional $89,000 from the profits it would have made absent Walker's alleged interference.

On cross-examination, Walker challenged Weber's calculations in part because Weber assumed that with additional runs Brookeside's costs would increase at a slower rate than they actually had in prior years when the number of runs increased. However, Weber explained the prior rise in increased expenses on redirect. Walker also challenged Weber's credibility by pointing out that he failed to consult a prospectus and offering circular of other ambulance companies.

After Weber testified, Walker moved to strike Weber's testimony based on its early objection to Weber's qualifications to testify as an expert witness. The court then struck Weber's testimony on the grounds that it was based upon assumed facts supplied by Kish and that his calculation of lost profits was not

established with reasonable certainty. The court concluded that the calculations were speculative because Weber looked only at the two companies involved and a statistical book and because he did not conduct a market survey.

Weber's calculation of Brookeside's damages was based upon two types of losses. The first type of loss was the direct loss of profits from actual runs missed due to Walker's alleged conduct of run jumping, station blocking, and using day cars. The second type of loss was the indirect loss of profits from estimated missed runs due to the fact that Brookeside had to close its stations and could not expand with the profits from the original two stations.

With respect to the first type of loss, we find that this calculation was based in part upon facts in evidence (namely, Kish's calculation of the number of runs missed because of Walker) and Weber's own investigation of Brookeside's records. Calculation of the amount of this loss involved a simple calculation of the profit loss for each run. Whether the run jump occurred is a matter for the trier of fact to determine. Therefore, we find that the trial court abused its discretion by striking this portion of the expert's testimony.

However, with respect to Weber's calculation of the additional lost profits (due to the inability to use its profits to continue and further expand its business), we find that there was no evidence in the record that Brookeside had plans to expand in the manner upon which Weber based his calculations. However, this issue is moot because we have found that Brookeside did present evidence of damages sufficient to avoid a directed verdict.

Brookeside also argues that the trial court erred by reversing its decision to permit the expert to testify. This issue is also moot because we have found that the trial court erred in granted the directed verdict.

Accordingly, we find appellant's first assignment of error well taken in part and moot in part.

The judgment of the Lucas County Court of Common Pleas is reversed. This cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

ABOOD and SHERCK, JJ., concur.