Jack A. BOWSHIER, et al., Plaintiffs,

v.

CHRYSLER FINANCIAL CORPORATION, et al., Defendants.

No. C–3–98–358.

United States District Court, S.D. Ohio, Western Division.

March 26, 2001.

---

Stanley Morganstern, Cleveland, OH, for plaintiffs.

Janice M. Paulus, Cleveland, OH, Terence L. Fague, Dayton, OH, Mary P. Cormier, Cambridge, MA, John A. Houlihan, Scott A. King, Dayton, OH, Mark F. Kennedy, Cleveland, OH, Michael W. Krumholtz, Dayton, OH, for defendants.

## DECISION AND ENTRY SUSTAINING DEFENDANT CHRYSLER FINANCIAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. # 81)

RICE, Chief Judge.

This litigation arises from the attempts of Plaintiffs Jack A. Bowshier and Linda L. Bowshier to repurchase the assets and franchise of Hitchcock Auto Group, Inc. ("HAG") and George W. Hitchcock ("Hitchcock"). As stated in their Amended Complaint, Plaintiffs own the real property, known as 4815 Urbana Road, located in Springfield, Ohio, subject to a mortgage held by Defendant Chrysler Financial Corporation ("CFC"), formerly known as Chrysler Credit Corporation. In January, 1994, Plaintiffs (and Plaintiffs' corporation, Jack Bowshier Buick–GMC–AMC–Jeep–Renault, Inc. ("Bowshier Buick")) entered into two agreements with HAG and Hitchcock, by which HAG would lease the property, for use as an automobile dealership, and purchase the assets of Plaintiffs' corporation (*See* Lease; "Buy/Sell Agreement" # 1). CFC financed HAG's purchase of Bowshier Buick's personal property and possesses a security interest in those assets. In addition, HAG gave to Bowshier Buick a purchase money security interest in all of the assets purchased by HAG.[1] These security interests were allegedly subordinated to CFC.[2]

On December 17, 1997, HAG entered into an agreement with Jack Bowshier to sell him HAG's personal property, which was used to operate the automobile dealership, as well as HAG's franchise rights (Buy/Sell Agreement # 2). This agreement was delivered to Defendant Chrysler Corporation ("Chrysler"), in accordance with Ohio Rev.Code § 4517.56. On May 28, 1998, Chrysler notified Mr. Bowshier that it refused to approve the transfer of the Hitchcock Jeep–Eagle franchise to him.

On July 7, 1998, HAG entered into an agreement with Linda Bowshier, in which she would purchase HAG's assets and certain franchise rights (Buy/Sell Agreement # 3). On June 7, 1998, Mrs. Bowshier submitted an application to Chrysler for approval of the transfer of the franchise, and, on July 17 and July 29, 1998, she notified that company of the name and address of her proposed management personnel.

According to CFC, by the Fall of 1997, HAG was having difficulty keeping current with its obligations to CFC under the terms of its Note and Security Agreement, arising from Buy/Sell Agreement # 1. By July 1, 1998, HAG owed CFC more than $1,654,475. Due to HAG's default, CFC sent a demand letter to HAG for the total amount due and owing to it. In response, HAG voluntarily surrendered its assets (*i.e.*, the collateral for CFC's loan) to CFC. On July 16, 1998, CFC entered the subject property (4815 Urbana Road) and took possession of HAG's personal property.

---

1. In responding to CFC's Motion for Summary Judgment, Plaintiffs now assert that Jack Bowshier, as opposed to Bowshier Buick, holds the security interest in HAG's personal property.

2. CFC disputes Plaintiffs' contention that they have a security interest in HAG's assets. However, it notes in its memorandum that Plaintiffs have conceded that, to the extent that they have any security interest, such interest is subordinated to CFC's perfected security in HAG's assets.

In August of 1998, CFC, as the creditor in possession, arranged for the sale of those assets to Stapleton Chrysler–Plymouth–Dodge–Jeep–Eagle, Inc. ("Stapleton Chrysler") and Bill Marine Auto Center, Inc. ("Bill Marine Auto").

In their Amended Complaint (Doc. # 11), Plaintiffs brought claims against CFC, Chrysler, HAG, Hitchcock, Stapleton Chrysler, Charles D. Stapleton ("Stapleton"), Bill Marine Auto, and Bill D. Marine ("Marine").[3] Plaintiffs have subsequently voluntarily dismissed Stapleton Chrysler and Stapleton (Doc. # 105), as well as Hitchcock and HAG (Doc. # 115), from this litigation. As for the remaining four Defendants (CFC, Chrysler, and the Marine Defendants), Plaintiffs have set forth a number of state law claims for relief (Doc. # 11), to wit:

A. claims that Plaintiffs will suffer irreparable harm if CFC and Chrysler complete the disposal of personal property and the transfer of the Jeep–Eagle franchise to persons other than Plaintiffs (Counts One, Two and Three);

B. a claim against CFC for interference with Plaintiffs' personal property rights (Count Four);

C. a claim against CFC for violating Plaintiffs' right to redeem collateral, pursuant to Ohio Rev.Code § 1309.49 (Count Five);

D. a claim against CFC for tortious interference with Linda Bowshier's business interests in the assets of HAG by disposing of those assets without Plaintiffs' consent (Count Six);

E. a claim against Chrysler for failing to reject the transfer to Jack Bowshier in a timely manner (Count Seven);

F. a claim against Chrysler for rejecting Jack Bowshier's application without good cause (Count Eight);

G. a claim against Chrysler for failing to reject Linda Bowshier's application in a timely manner (Count Nine);

H. a claim against Chrysler for tortious interference and violations of Ohio Rev.Code § 4517.56 (Count Ten);

I. a claim against CFC and Chrysler for tortious interference, based on the disposal of assets prior to ruling on Linda Bowshier's application (Count Eleven);

J. a claim against CFC for orchestrating Plaintiffs' default on their real estate mortgage (Count Twelve);

K. a claim against CFC for tortious interference with Plaintiffs' business relationship with Nissan Motor Corporation, by disposing of Nissan assets (Count Thirteen);

L. a claim against CFC and the Stapleton Defendants for civil conspiracy, based on tortious interference with Plaintiffs' transactions with Hitchcock and HAG, pursuant to the Buy/Sell Agreements # 2 and # 3 (Count Fourteen);

M. a claim against CFC and the Marine Defendants for civil conspiracy, based on tortious interference with Plaintiffs' transactions with Hitchcock and HAG, pursuant to

---

**3.** In the Amended Complaint, Plaintiffs attempted to join Jack Bowshier Buick–GMC–AMC–Jeep–Renault, Inc., as a party-plaintiff. However, the Court did not allow such joinder, because to do so would have destroyed this Court's diversity jurisdiction (Doc. # 62). Accordingly, that corporation is not a plaintiff in this litigation.

the Buy/Sell Agreements #2 and #3 (Count Sixteen);

N. a claim against CFC for nonpayment of rent (Count Eighteen).

Pending before the Court is CFC's Motion for Summary Judgment (Doc. #81).[4] For the reasons assigned, that Motion is SUSTAINED. As a means of analysis, the Court will first set forth the standard governing CFC's Motion, and then turn the merits of same.

## I. *Standard for Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden

then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324,

---

4. Chrysler and the Marine Defendants have also filed motions for summary judgment (Doc. #108 and Doc. #109, respectively).

The Court will address those motions in separate rulings.

106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

II. *CFC's Motion for Summary Judgment (Doc. # 81)*

CFC seeks summary judgment on Plaintiffs' claims against it. *First,* CFC argues that it did not tortiously interfere with the Bowshiers' contracts with HAG (Counts Six and Eleven) and Nissan (Count Thirteen), and that it did not tortiously interfere with their business transactions by disposing of the collateral and other assets of HAG (Count Ten). *Second,* CFC contends that it did not engage in a civil conspiracy (Counts One, Two, Three, Fourteen, and Sixteen), because it did not engage in any underlying unlawful act, namely tortious interference with the Bowshiers' business relationships or contracts. *Third,* Defendant argues that the Bowshiers were not third-party beneficiaries of its agreements with HAG, as a matter of law (Count Four). *Fourth,* CFC asserts that it is not obligated to pay rent for its use of the dealership premises, due to a letter agreement between it and Plaintiffs (Count Eighteen). *Fifth,* it argues that it did not violate the Bowshiers' right to redeem the collateral (Count Five). *Finally,* CFC argues that it did not act improperly in taking possession of its collateral upon its surrender by HAG (Count Twelve).

In their Opposition Memorandum, Plaintiffs address only three of CFC's arguments. *First,* Plaintiffs argue that CFC violated Ohio Rev.Code § 1309.49 by refusing to let them redeem the collateral (Count Five). *Second,* they state that

CFC received an authenticated notification of their security interest in HAG's personal property, and because CFC never sent notice to the Bowshiers before disposing of the property, the sale of the Jeep parts, tools and equipment was not performed in a commercially reasonable manner. Presumably, this argument was intended to address CFC's motion for summary judgment on Linda Bowshier's tortious interference claim, based on the disposal of HAG's asserts without Plaintiffs' consent (Count Six). *Third,* Plaintiffs reassert that Chrysler violated Ohio Rev.Code § 4517.56 by failing to evaluate Linda Bowshier's application using reasonable criteria, and by failing to give written notice of its decision within thirty (30) days of receipt of her application. Plaintiffs argue that CFC "supported these violations by their actions mentioned above." (Doc. # 93 at 6). Presumably, this argument is intended to support their claim against CFC and Chrysler for tortious interference, based on the disposal of HAG asserts prior to ruling on Mrs. Bowshier's application (Count Eleven). In their memorandum, Plaintiffs do not dispute or discuss, in any manner, CFC's arguments regarding the additional claims for tortious interference with business or contractual relationships (Counts Eight and Ten), the claims for civil conspiracy (Counts One, Two, Fourteen, and Sixteen) and for nonpayment of rent (Count Eighteen). Accordingly, Defendant CFC's Motion for Summary Judgment on those claims is SUSTAINED. However, for the sake of completeness, the Court will briefly address those claims, as well. As a means of analysis, the Court will begin with Plaintiffs' tortious interference claims, as they make up the bulk of their allegations, and then turn to the remaining claims.

### A. *Plaintiffs' Claims of Tortious Interference with Contracts and Business Relationships (Counts Six, Ten, Eleven, Thirteen)*

] A claim for tortious interference with contractual relations occurs, *inter alia,* when a person, without a privilege to do so, purposefully causes a third party not to enter into a contract with another. In order to establish a claim for tortious interference with a business relationship, a party must show: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *A & B–Abell Elevator v. Columbus/Cent. Ohio Bldg.,* 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995); *Kand Med. v. Freund Med. Prods.,* 963 F.2d 125 (6th Cir.1992); *Brookeside Ambulance, Inc. v. Walker Ambulance Service,* 112 Ohio App.3d 150, 155–156, 678 N.E.2d 248 (1996). In order to determine the existence of a privilege, the fact-finder must consider: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relationship between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977).

It is undisputed that Plaintiffs entered into a number of contractual relationships, *i.e.,* the lease with HAG and the Hitchcocks, Buy/Sell Agreement # 1,[5] Buy/Sell

---

**5.** The Court notes that Buy/Sell Agreement # 1 (Pls' Ex. B) indicates that the lessors were

Jack and Linda Bowshier. However, the sell-

Agreement # 2, and Buy/Sell Agreement # 3. Plaintiffs have provided evidence that CFC was aware of each of these contracts. It is further undisputed that, in July, 1998, CFC entered the dealership premises and took possession of HAG's assets. Thus, the issues with regard to Plaintiffs' tortious interference claims are: (1) whether CFC's actions were intentional and taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; and (2) whether CFC had a privilege so to act. Plaintiffs have failed to provide evidence that either of these elements can be met.

In support of its Motion, CFC has provided evidence (and Plaintiffs have not disputed) that it had a perfected security interest in all of the inventory and assets of HAG. It has provided further evidence that by November, 1997, HAG was having difficulty keeping current with its obligations to CFC under the terms of the Note and Security Agreement, and that HAG was "out of trust" over $415,000 (Herzog Aff. ¶ 12).[6] On July 1, 1998, HAG owed CFC $1,654,475 and had been "out of trust" and in default since at least November, 1997 (Herzog Aff. ¶ 12–14). In addition, at that time, an electronic funds transfer to CFC for $164,000 was rejected by HAG's bank. On July 1, 1998, CFC sent a demand and default letter to HAG, stating that all outstanding amounts due to CFC were immediately due and payable in full, and that if those amounts were not paid within thirty (30) days, CFC would take whatever action was appropriate to enforce its rights (Herzog Aff. ¶ 15, Ex. 4). HAG voluntarily surrendered its assets and inventory to CFC on July 13, 1998

(id.¶ 17). Thus, CFC argues, it simply exercised its contractual rights under the Note and Security Agreement with HAG when it seized HAG's personal property. In their memorandum, Plaintiffs have not cited to any evidence to contradict CFC's evidence regarding HAG's default or CFC's right to the collateral. Thus, CFC's legal right to foreclose is uncontroverted.

A number of Ohio courts have stated that, for purposes of a claim for tortious interference with business or contractual relationships, a third-party may, in good faith, interfere with such an interest in order to protect a legally protected interest which might otherwise be impaired. See *Elwert v. Pilot Life Ins. Co.*, 77 Ohio App.3d 529, 602 N.E.2d 1219 (1991) (citing *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 239 (1977), for the proposition that purposeful interference with a third-party business relationship is privileged if undertaken in good faith to protect properly a legally protected interest which might otherwise be impaired or destroyed). For example, in *Metropolitan Life Ins. Co. v. Triskett Ill., Inc.*, 97 Ohio App.3d 228, 646 N.E.2d 528 (1994), MetLife and Triskett entered into a loan agreement, pursuant to which MetLife agreed to lend Triskett $5,400,000 to fund Triskett's purchase of a commercial office park. By 1990 (two years later), the income from the tenant base in the buildings was insufficient to cover the payments, which Triskett was required to pay to MetLife under their loan agreement. Although the parties attempted to reach an agreement regarding modification of

er of the personal property was Bowshier Buick, not Plaintiffs.

**6.** According to CFC, floor-plan financing is a secured transaction whereby a secured lender (a floor-plan financier) loans money to an automobile dealer for the cars on its floor-

plan. The phrase "sold out of trust" refers to a sale on which the automobile dealer fails to remit the funds to its floor-plan lender when the vehicle is sold, and the dealer is paid by the consumer (Herzog Aff. ¶ 11).

the loan terms, no agreement was reached, and Triskett was notified that it was in default. By letter dated February 26, 1991, MetLife "advised" Triskett that, "due to [Triskett's] default on the loan, MetLife [was] pursuing legal remedies to protect its interest." MetLife filed a suit against Triskett for foreclosure and the appointment of a receiver. Triskett counterclaimed, alleging, *inter alia*, that Met-Life, by instituting its foreclosure action and seeking the appointment of a receiver, tortiously interfered with Triskett's business relationships with its lenders, vendors and tenants. The trial court granted summary judgment to MetLife on Triskett's claim for tortious interference with business relationships. On appeal, the court of appeals affirmed, stating, in pertinent part: "The record before us is devoid of evidence that MetLife, in exercising its contractual rights to foreclosure and the appointment of a receiver, detrimentally interfered with Triskett's third-party business or contractual relationships or that it acted with the intention to do so and is supportive of a determination that Met-Life's conduct, whatever its practical effect on Triskett's third-party relationships, was privileged." 646 N.E.2d at 533.

In the instant case, Plaintiffs have not presented evidence that HAG was not, in fact, in default, or that CFC had no legal right to foreclose. Although CFC's foreclosure on HAG's promissory note and its disposal of HAG's assets had the effect of undermining HAG's contract with Linda Bowshier, there is no evidence that CFC's actions were taken other than to protect its own legal rights. Nor have Plaintiffs presented evidence that CFC acted with the intention of disrupting the contract between Linda Bowshier and HAG. To the contrary, Defendant has provided undisputed evidence that, upon knowledge of Buy/Sell Agreement # 3, it deferred any action against HAG's personal property until further action had been taken on the contract or until August 10, 1998, whichever came first. In such circumstances, CFC's actions were privileged, and Plaintiffs have presented no evidence that indicates otherwise. Moreover, by correspondence dated July 21, 1998, Linda Bowshier reaffirmed her commitment to purchase HAG's fixed assets and franchise rights, despite the knowledge that CFC had taken control of the assets and had closed HAG's business (Pls' Ex. N). Thus, there is no evidence that CFC's foreclosure detrimentally interfered with the contractual agreement between HAG and Mrs. Bowshier. Accordingly, Plaintiffs have not presented evidence to create a genuine issue of material fact as to whether CFC was privileged to take possession of HAG's personal property and to dispose of same, in the present circumstances. Accordingly, Defendant CFC's Motion for Summary Judgment on Plaintiffs' claims of tortious interference with business or contractual relationships is SUSTAINED.

## B. *Tortious Interference with Right to Redeem (Count Five)*

In Count Five, Plaintiffs allege that CFC violated their right to redeem the collateral, pursuant to Ohio Rev.Code § 1309.49. That statute provides, in pertinent part:

> At any time before the secured party has disposed of collateral or entered into a contract for its disposition under section 1309.47 of the Revised Code or before the obligation has been discharged under division (B) of section 1309.48 of the Revised Code, the debtor or any other secured party may, unless otherwise agreed in writing after default[,] redeem the collateral by tendering fullfillment [sic] of all obligations secured by the collater-

al as well as the expenses reasonably incurred by the secured party in retaking, holding, and preparing the collateral for disposition, in arranging for the sale. Ohio Rev.Code § 1309.49. In order for § 1309.49 to apply herein, Plaintiffs must constitute secured parties, within the meaning of that statute. Accordingly, the Court now turns to that issue.

In their memorandum, Plaintiffs argue that "[t]he events created a security interest in favor of Jack and Linda Bowshier in the personal property, tools and equipment [sic] of Hitchcock Auto Group, Inc." (Doc. # 93 at 1-2). They further cite to Buy/ Sell Agreement # 1 (id., Ex. A), and the Promissory Note, executed by Hitchcock in favor of Jack Bowshier, in the amount of $100,000 (id., Ex. B), as evidence of such an interest, as well as CFC's internal memorandum, which state that the company should obtain a subornation agreement regarding the Note due to Mr. Bowshier. Upon review of the evidence, the Court concludes that Plaintiffs have failed to create a genuine issue of material fact that they have any security interest in HAG's property.

Under Ohio Rev.Code § 1309.14, three criteria, at a minimum, must be met for a nonpossessory security interest to attach to any collateral (*i.e.*, the initial steps necessary for a security interest to be enforceable against the debtor or third parties), to wit: (1) the debtor has signed a written security agreement which contains a description of the collateral; (2) value has been given; and (3) the debtor has rights in the collateral. Ohio Rev.Code § 1309.14(A); *In re DeVincent*, 238 B.R. 722, 725 (Bankr.N.D.Ohio 1999), citing *National City, Bank, Northeast v. Specialty Tires of America, Inc.*, 109 Ohio App.3d

387, 391–92, 672 N.E.2d 232, 235 (1996). Herein, value had been given, as a result of Lease and Buy/Sell Agreement # 1 between Plaintiffs and HAG, and HAG (the debtor) was granted rights in the personal property. Thus, the sole question is whether a written security agreement exists.

■■■ "The creation of a security interest does not mandate the usage of a form or document so entitled, nor does it require any magical recitation of language to establish the existence of a security interest." *Silver Creek Supply v. Powell,* 36 Ohio App.3d 140, 143–44, 521 N.E.2d 828 (1987). Rather, the fact finder must only ascertain whether there was language in the instrument which would lead to the "logical conclusion that it was the intention of the parties that a security interest be created." *In re DeVincent,* 238 B.R. at 726, quoting *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir. 1972). Looking at the Promissory Note, nothing in the terms of that document indicates that Hitchcock granted Plaintiffs a security interest in the personal property at issue. *See id.* ("[G]iven the fact that under Ohio law a promissory note, standing alone, does not grant to the holder of the note any actual interest in any specific piece of property, this Court cannot come to the logical conclusion that it was the intention of the Parties, vis-a-vis the promissory note, to create a security in the Debtor's vehicle."). Moreover, looking at the note in conjunction with Buy/Sell Agreement # 1, those documents provide no basis for the Court to conclude that the intent of the parties was to create a security interest. Accordingly, Plaintiffs have not presented evidence that they have an enforceable security interest in HAG's personal property.[7]

---

7. The Court notes that Plaintiffs' Complaint

alleges that "Hitchcock Auto Group pledged

■] As noted by CFC, Plaintiffs have previously argued that they have an interest in HAG's property, due to a landlord lien. In their Response to CFC's First Set of Interrogatories, Plaintiffs stated, in pertinent part: "CFC knew of Bowshier's status as landlord, the integral relationship between the Buy/Sell Agreement # 1 and the Lease, and the purchase of the dealership asserts in Buy/Sell # 1. The Bowshiers have subordinated their security in the property to CFC through the landlord's Waiver of Lien, but had not totally extinguished it. As a prospective transferee, Linda Bowshier had an interest in the dealership property." (Doc. # 81, Appendix of Test., Ex. 5) Defendant has provided the Court with a copy of the Waiver of Landlord's Lien (Id., Appendix of Exhibits, Ex. 17). In that document, Plaintiffs unambiguously waive all rights to HAG's chattel which they held as lessors of the dealership property. Plaintiffs have provided no evidence that they retained any rights (secured or not) to said chattel as landlords. Accordingly, the undisputed evidence indicates that Plaintiffs have no remaining interest in the personal property at issue, by virtue of their status as landlords.

■ In their Response to CFC's Interrogatories, Plaintiffs suggest that Mrs. Bowshier had an interest in HAG's personal property, due to the signed Buy/Sell Agreement # 3. Although no legal theory has been articulated, Mrs. Bowshier presumably is relying on the doctrine of equitable conversion. "Under the long-recognized doctrine of equitable conversion, where land is contracted to be sold, even under an executory contract, equity treats the exchange as actually taking place when the contract becomes effective." *Wood v. Donohue*, 136 Ohio App.3d 336, 339, 736 N.E.2d 556, 558 (1999)(applying doctrine to settlement proceeds). Assuming, *arguendo*, that the doctrine of equitable conversion applies herein, thus granting to Mrs. Bowshier an equitable ownership interest in HAG's chattel, that interest, as a matter of law, does not rise to the level of a security interest. Accordingly, Plaintiffs have failed to raise a genuine issue of material fact that they had a security interest in HAG's personal property. Thus, Plaintiffs likewise have failed to provide evidence that they are a secured party, within the meaning of Ohio Rev. Code Ch. 1309. Accordingly, they were not entitled to redeem the collateral at issue. Moreover, as discussed by Defendant, even assuming Plaintiffs were secured parties, they have failed to present evidence that they "tendered fulfillment", within the meaning of § 1309.49. Accordingly, CFC is entitled to summary judgment on Plaintiffs' claim for interference with their right to redeem (Count Five).

C. *Tortious Interference with Linda Bowshier's Business Interests in the Assets of HAG by Disposing of those Assets without Her Consent (Count*

to *Bowshier [Buick]* a purchase money security interest in all of the assets purchased by Hitchcock Auto Group." (A.Compl.¶ 21)(emphasis added). The Complaint does *not* assert that *Plaintiffs* were also granted a security interest in the personal property, by virtue of Buy/Sell Agreement # 1, and, as noted above, Bowshier Buick is not a party to this litigation.

In addition, CFC's internal memoranda do not create a genuine issue of material fact as to whether Plaintiffs held a security interest in HAG's assets. Those documents indicate that CFC wanted to obtain a subordination agreement regarding the $100,000 note, payable to Jack Bowshier. Although the documents clearly indicate that CFC was aware of the note, it does not establish that the note and related documents created a security interest, or that such an interest was held by Plaintiffs, as opposed to Bowshier Buick.

*Six)* [8]

In Count Six, Plaintiffs assert that CFC tortiously interfered with Linda Bowshier's interest in HAG's assets by disposing of same without her consent. Ohio Rev.Code § 1309.47 provides that "reasonable notification of the time after which any private sale or other intended disposition [of the collateral] is to be made shall be sent by the secured party to the debtor...." Except in cases involving consumer goods, notification must also be sent to "any other secured party from whom the secured party has received, before sending notification to the debtor or before the debtor's renunciation of the debtor's rights, written notice of a claim of any interest in the collateral." *Id.* Although Mrs. Bowshier arguably had some interest that the personal property of HAG, by virtue of Buy/Sell Agreement #3, she was not the debtor, and she has not provided evidence that she constitutes another secured party. Accordingly, she has not established that she was entitled to notification by CFC prior to that company's disposition of the property. Thus, Plaintiffs have failed to create a genuine issue of material fact that CFC tortiously interfered with Linda Bowshier's business interests by disposing of HAG's assets without her consent.

D. *The Bowshiers were not Third–Party Beneficiaries (Count Four)*

In Count Four, Plaintiffs allege that they are third-party beneficiaries of all agreements entered into by HAG and Hitchcock for purposes of funding and financing the purchase of assets in Buy/Sell #1. They further allege that CFC's removal of the personal property from the dealership premises defeats the consideration given by HAG and Hitchcock for the Lease and Buy/Sell Agreement #1. Thus, CFC allegedly interfered with the property rights granted to Plaintiffs by those two agreements.

Ohio has recognized that certain third-party beneficiaries may assert rights as if they had been signatories to the contract. *See Visintine & Co. v. New York, Chicago & St. Louis R. Co.,* 169 Ohio St. 505, 160 N.E.2d 311 (1959); *Norfolk & Western Co. v. United States,* 641 F.2d 1201, 1208 (6th Cir.1980). The Ohio Supreme Court has distinguished between two kinds of beneficiaries: intended beneficiaries and incidental beneficiaries. *Id.* Adopting section 302 of the Restatement of the Law 2d, Contracts (1981), the Ohio Supreme Court has stated,

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Hill v. Sonitrol of Southwestern Ohio,* 36 Ohio St.3d 36, 521 N.E.2d 780, 784 (1988).

---

8. The Court has already addressed Count Six in its general discussion of Plaintiffs' tortious interference claims. *See, supra,* Part IIA. However, in their Opposition Memorandum, Plaintiffs specifically address Count Six, arguing that they did not receive notice from CFC of the intended disposal. Accordingly, the Court considers it appropriate to address this claim separately, as well.

■ The Sixth Circuit has applied this standard with an "intent to benefit" test. *Norfolk & Western Co.,* 641 F.2d at 1208; *TRINOVA Corp. v. Pilkington Bros.,* 70 Ohio St.3d 271, 638 N.E.2d 572, 577 (1994). Under this analysis, in determining whether a person is an intended beneficiary, the inquiry is whether the promisee intends that a third party should benefit from the contract. *Id.* Even if a third party benefits from the contract, if the promisee has no intent to benefit such, then any third-party beneficiary to the contract is merely an incidental beneficiary who has no enforceable rights or obligations under the contract. *Id.; Hill,* 521 N.E.2d at 784. "There must be evidence that the promisee assumed a duty to the third party." *TRINOVA Corp.,* 638 N.E.2d at 577.

"Those cases which have construed whether a contract was made for the direct or incidental benefit of a third party have looked necessarily to the language of the contract to make this determination." *Hill,* 521 N.E.2d at 785; *Point East Condo. Owners' Ass'n, Inc. v. Cedar House Assoc. Co.,* 104 Ohio App.3d 704, 663 N.E.2d 343, 356 (1995). In *Hill, supra,* a bookstore employee sued a security system company as a third-party beneficiary to a contract between her employer and a security system when the employee and her husband were accosted outside the store and held inside by an assailant. The Ohio Supreme Court found that the contract was intended to protect only the property in the store, not people, and therefore the employee was not an intended beneficiary of the contract. *Id.*

In contrast, in *Anderson v. Olmsted Utility Equip., Inc.,* 60 Ohio St.3d 124, 573 N.E.2d 626 (1991), the Ohio Supreme Court found that city workers, who were injured when a "cherry picker" device which they were using failed, could sue as third-party beneficiaries of a contract between the city and Olmsted to rebuild the device. In so finding, the court stated that the city clearly intended the workers to benefit from the contract, because the purpose of rebuilding the device was the safety of linemen. *Id.* at 631–32.

■ To determine whether Plaintiffs are third-party beneficiaries of the financing agreements between HAG and Hitchcock and CFC, the Court must look to the contracts between those parties. In other words, the Court must look at the financing agreements to determine whether HAG and CFC *intended to benefit* the Bowshiers. The fact that the Bowshiers may have received a benefit is not dispositive. Upon review of the Security Agreement and Master Credit Agreement, as well as the renewal promissory note, dated November 11, 1997 (Def.'s Ex. 1, Ex. 2), which HAG and CFC executed, there is no indication that the parties intended the Bowshiers to benefit from those contracts. The "Whereas" portion of the Security Agreement sets forth the purpose of the loan by CFC. It states, in pertinent part:

WHEREAS, Debtor is engaged in business as an authorized dealer of Chrysler Corporation and desires Secured Party to finance the acquisition by Debtor in the ordinary course of business of new and used vehicles sold and distributed by Chrysler Corporation and/or other authorized sellers and of used vehicles (all such unused and used vehicles being hereinafter collectively called the "Vehicles").

WHEREAS, Secured Party is willing to provide wholesale financing to Debtor to finance the acquisition of Vehicles by Debtor (1) by agreeing with Chrysler Corporation to purchase from Chrysler Corporation receivables evidencing credit sales of Vehicles by Chrysler Corporation to Debtor, and (2) by making loans or advances to Debtor to finance the

acquisition by Debtor of Vehicles from other sellers.

Although a third-party beneficiary need not be specifically named in the contract, *Edward F. Siegel, Co., L.P.A. v. Dana Business Credit Corp.*, 1994 WL 393718 (1994), there is no indication from these statements, or any others in the Security Agreement and Master Credit Agreement, that the parties made the promises in the agreement for the Bowshiers' benefit. Rather, the agreement indicates only that CFC would provide funds so that HAG could acquire vehicles in furtherance of its business as an authorized Chrysler dealer. It appears that the credit extended to HAG by CFC was simply the source of funds by which HAG paid for the assets conveyed by the Bowshiers and Bowshier Buick. See *Edward F. Siegel, Co., L.P.A.*, 1994 WL 393718; *Creative Hardwood Floors, Inc. v. Schafer*, 1998 WL 515783 (1998).

Even assuming that the Bowshiers were third-party beneficiaries of the contract, the Court sees no basis for the conclusion that such a status created a basis for Plaintiffs' tortious interference claim. As third-party beneficiaries, Plaintiffs would have the right to enforce the contract between HAG and CFC, as though it were a signatory to that loan agreement. Plaintiffs do not attempt to assert any claim against CFC arising out of its loan agreement with HAG. Moreover, in their Opposition Memorandum, Plaintiffs have failed to articulate any theory as to how any third-party beneficiary status provides them with a basis for rights in HAG's assets. Accordingly, Plaintiffs have not demonstrated a genuine issue of material fact exists regarding their status as third-party beneficiaries, nor have established that a claim exists on that basis. Accordingly, Defendant's Motion for Summary Judgment on Count Four is SUSTAINED.

### E. Civil Conspiracy Claims (Counts Fourteen and Sixteen)[9]

 The Supreme Court of Ohio defines civil conspiracy as " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995) (quoting *LeFort v. Century 21–Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640, 645 (1987)); *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.*, 219 F.3d 519, 534 (6th Cir.2000). In order to establish a claim of civil conspiracy, the following elements must be proven: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993); *Aetna*, 219 F.3d at 534.

 A civil conspiracy claim cannot succeed without an underlying unlawful act. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998). Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must

---

9. In Counts One, Two, and Three, Plaintiffs state that they will suffer irreparable harm if CFC and Chrysler complete the disposal of the personal property and transfer the franchise to persons other than Plaintiffs. CFC has construed these allegations as claims for civil conspiracy. However, they appear to support Plaintiffs' requests for a temporary restraining order, preliminary injunction, and permanent injunction. In light of the fact that no preliminary injunction was granted and the collateral has since been disposed by CFC, these claims appear to be moot.

also fail. *El–Shiekh v. Northwest Ohio Cardiology Consultants, Inc.,* 2000 WL 1298761 (Sept. 15, 2000). "The general rule is that a conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action." *Minarik v. Nagy,* 8 Ohio App.2d 194, 195–96, 193 N.E.2d 280, 281 (1963). Accordingly, a plaintiff may not bring a claim for conspiracy unless he can also state a claim for the underlying cause of action. *See Hollinghead v. Bey,* 2000 WL 1005205 (July 21, 2000) (dismissing conspiracy claim because the malicious prosecution claim, the underlying cause of action, was barred by the statute of limitations).

Plaintiffs' civil conspiracy claims are based on their allegations that CFC tortiously interfered with their transactions with Hitchcock and HAG, pursuant to Buy/ Sell Agreements # 2 and # 3, presumably by CFC arranging for the disposal of HAG's assets through sales to the Marine Defendants and the Stapleton Defendants. As discussed above, Plaintiffs have failed to present evidence that CFC acted without privilege when it took possession of HAG's assets and arranged for their disposal. Thus, Plaintiffs have failed to present evidence of their underlying cause of action. Accordingly, Plaintiffs' civil conspiracy claims must also fail. CFC's Motion for Summary Judgment on those claims (Counts Fourteen and Sixteen) are SUSTAINED.

F. *Claim for Orchestrating Default (Count Twelve)*

In Count Twelve, Plaintiffs allege that CFC's possession of HAG's property was an attempt by CFC to orchestrate a default of their loan. In essence, Plaintiffs' claim is that CFC wanted to obtain their real estate, for which it was the mortgagee, for an amount less than its actual value. Moreover, Plaintiffs contend that CFC knew that they were reliant upon HAG's rental payments in order to make their mortgage payments to CFC. Thus, in order to obtain Plaintiffs' property, CFC allegedly took possession of HAG's collateral and ceased HAG's operations, so that HAG would default on its lease and Plaintiffs would default on their mortgage.

] As discussed above, Plaintiffs have provided no evidence that CFC either concocted or caused HAG's default on its loan. In addition, Plaintiffs have not disputed CFC's evidence that it was legally entitled to foreclose and to obtain possession of the collateral. Thus, Plaintiffs' claim is based on the proposition that CFC, a secured creditor, may be liable for wrongful foreclosure if it exercised its legal rights, in part, for a malicious purpose. The Court has found no basis for such a claim. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d 252, 262–63 (1st Cir.1997)(rejecting claim that "reduces to the proposition that a secured creditor, with an uncontested right to foreclose under the terms of a valid security agreement, nonetheless may be liable on a claim for wrongful foreclosure should a jury find that the secured creditor exercised its right based in part on a clandestine purpose unrelated to the default."); *E.A. Miller, Inc. v. South Shore Bank,* 405 Mass. 95, 539 N.E.2d 519, 523 (1989)("The essence of bad faith, in this context, is not the [secured creditor's] state of mind but rather the attendant bad actions."). Because Plaintiffs' claim is based solely on CFC's wrongful intent and because they have provided no evidence that CFC acted outside the scope of its legal rights,[10]

---

**10.** Although Plaintiffs argue that CFC's disposal of the collateral was not performed in a

commercially reasonable manner, because they were not given notice prior to such dis-

Plaintiffs' claim for orchestrating their default must fail, as a matter of law. CFC's Motion for Summary Judgment on that claim is SUSTAINED.

### G. *Failure to Pay Rent (Count Eighteen)*

■ In Count Eighteen, Plaintiffs assert that CFC has failed to pay rent that is due and owing to them, due to CFC's possession of the dealership real property. In their Motion, Defendant asserts that it has reached an agreement with Plaintiffs, whereby the parties agreed that the Bowshiers will not seek rent or other occupancy payments from CFC or its assignees, except for the period after October 4, 1998, if any, that it has possession of the property. In support of that argument, CFC has submitted copies of correspondence between CFC and the Bowshiers' counsel, indicating that such an agreement was reached on September 10, 1998 (Doc. # 81, Ex. 12). The correspondence clearly indicates that such an agreement was reached. CFC has provided further evidence that it occupied that premises from July 13, 1998, until October 1, 1998 (Affidavit of Leo Herzog ¶ 19). Plaintiffs have submitted no evidence to contradict this evidence. Accordingly, there is no genuine issue of material fact that the Bowshiers are not entitled to rent payments from CFC for its occupancy of the Bowshiers' real property on Urbana Road. Accordingly, Defendant CFC's Motion for Summary Judgment on this claim is SUSTAINED.

In their Opposition Memorandum, Plaintiffs have failed to address the vast majority of CFC's arguments, and have provided little legal analysis in support of their claims. However, after a review of the cited evidence and the relevant case law, the Court concludes that there are no genuine issues of material fact, and that CFC is entitled to judgment as a matter of law. Specifically, Plaintiffs have failed to create a genuine issue of material fact that CFC acted without privilege when it took possession of, and disposed of, HAG's personal property (*i.e.*, the collateral in its loan agreement); that they held an enforceable security interest in HAG's assets, and that they constituted third-party beneficiaries of HAG's loan agreement with CFC. Defendant CFC is entitled to summary judgment on each of Plaintiffs' claims against it. Accordingly, Defendant's Motion for Summary Judgment (Doc. # 81) is SUSTAINED.

posal, Plaintiffs have not asserted any other basis for the Court to conclude that CFC's

actions were not commercially reasonable.